1997-NMSC-029

941 P.2d 494

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Michael BROWN, Defendant–Appellant.**

**No. 22999.**

Supreme Court of New Mexico.

May 8, 1997.

Rehearing Denied June 26, 1997.

T. Glenn Ellington, Chief Public Defender, Bruce Rogoff, Appellate Defender, Santa Fe, for Appellant.

Tom Udall, Attorney General, Steven S. Suttle, Assistant Attorney General, Santa Fe, for Appellee.

## OPINION

FRANCHINI, Chief Justice.

1 Michael Brown appeals his conviction of two counts of first-degree murder, conspiracy to commit murder, unlawful taking of a motor vehicle, and tampering with evidence. NMSA 1978, § 30–2–1(A) (Repl.Pamp.1994) (murder in the first degree); NMSA 1978, § 30–28–2(A) (Repl.Pamp.1994) (conspiracy); NMSA 1978, § 66–3–504 (Repl.Pamp.1994) (unlawful taking of a motor vehicle); NMSA 1978, § 30–22–5 (Repl.Pamp.1994) (tampering with evidence). Brown raises three issues in this appeal. First, he asserts that the trial court erred in limiting the cross-examination of Jeremy Rose, a co-defendant, with respect to bias. Second, he asks this Court to reconsider the standard of review when a court reviews limits placed by the trial court on cross-examination. Third, he claims he was denied a fair trial because of a

misstatement made by the prosecutor during rebuttal argument. We affirm.

**2** *Facts.* Michael Brown's grandparents, Ed and Marie Brown, were found stabbed to death in their Rio Rancho home on February 4, 1994. Ed Brown was stabbed fifty-eight times; Marie Brown six times. At the time of the murders, Michael had been living with his grandparents in their home. The day following the murders Michael and two of his friends, Bernadette Setser and Jeremy Rose, were arrested in connection with the murders. The three were taken into custody at the home of Kelly Fisk, a friend of Bernadette.

**3** Jeremy pled guilty to one count of first-degree murder. In negotiating the plea, Jeremy agreed to testify at the separate trials of Bernadette and Michael. Bernadette was convicted of two counts of murder, conspiracy to commit murder, larceny, and stealing a car. Following her conviction Bernadette testified at Michael's trial.

**4** Bernadette had a history of mental and emotional problems. Her friend Kelly testified that Bernadette always lied to her and was prone to exaggerate. Kelly testified that Bernadette had lied to her in the past about having a baby and about being in a car accident. Kelly further testified that Bernadette, Michael, and Jeremy had come to her house the day following the murders. As the four sat in Kelly's small bedroom, Bernadette described the details of the murders. Neither Michael nor Jeremy responded as Bernadette told Kelly that, along with Jeremy, she had killed Michael's grandparents, and that Michael had planned the killing. Kelly did not believe Bernadette because "she always lied to me."

**5** In his opening statement defense counsel told the jury that Jeremy had entered into a plea agreement in which he agreed to testify at the trials of Bernadette and Michael, in return the State dismissed all of the charges against him, except one for first-degree murder—the State "cut him a deal." Defense counsel went on to explain:

> What does that mean? In terms of numbers it means that when someone is convicted of first-degree murder they are looking at a capital offense which means they are looking at a life sentence. A life sentence in the State of New Mexico is thirty years without parole. Jeremy Rose was looking at two life sentences.

**6** At this point the trial court judge asked the attorneys to approach the bench and expressed his concern that the jury is not "supposed to know what the possible penalties involved in this case are." Defense counsel explained that his comments concerned the impeachment of Jeremy. The judge allowed defense counsel to continue but said he would entertain a motion for mistrial. Defense counsel resumed his opening statement saying: "Mr. Rose, because of his plea, is looking at serving less than half the time of what he would have."

**7** The State moved for a mistrial. At the hearing on that motion, the court found that the issue of punishment was improperly introduced at the trial, and that the statements made were improper and prejudicial to the State. However, the court decided that an instruction would cure any prejudice and denied the State's motion for mistrial. The court also set parameters for cross-examination:

> I think it is black-letter law in this state that the issue of possible penalties should not be introduced to the jury and they are not to consider those issues. Therefore I deny [defense counsel's] request to discuss those issues. However, I will allow [defense counsel] to cross-examine about the plea agreement, and about the charges which [Jeremy] did plead guilty to, and the charges that were dropped. That gives [defense counsel] an effective cross-examination, and gives [defense counsel] enough information to address the possible bias that the witness may have, and to impeach his credibility.

**8** The court gave the following curative instruction, based in substantial part on Uniform Jury Instructions 14–6006 and 14–6007:

> During opening statement the issue of the possible penalties was inadvertently introduced to the jury. It is your duty to determine the facts from the evidence produced here in court, neither sympathy nor prejudice should influence your verdict.

You must not concern yourself with the consequences of the verdict. What is said in opening statements is not evidence.

In addition the court asked the jurors whether they would have difficulty deciding the case solely on the facts, putting aside the issue of the possible penalties, and offered them each an opportunity to speak with the court in chambers on this issue.

9 On cross-examination Jeremy testified that he gave a statement to the district attorney in anticipation of, and as part of, his plea agreement. The agreement permitted him to plead guilty to one count of first-degree murder. He acknowledged that he had read the statements of Michael and Bernadette, the grand jury testimony, and police reports before giving the statement. He further testified that this was the first time he had given a detailed statement of the events surrounding the murders of Ed and Marie.

10 Jeremy also testified to three brief statements he had made concerning the murders before giving his statement to the district attorney. On the day following the murders, while at the home of Kelly, he told an officer, "We killed them." At the station house following his arrest, he told an officer that Bernadette had participated in the killings, and further, that because they were so drunk, he did not know why they killed Ed and Marie. He testified that he told a cell mate that he had nothing to do with the murders. Earlier in the trial, jurors had heard the cell mate testify that Jeremy told him that Michael participated directly in the murders.

11 Michael's version of the events surrounding the murders was generally consistent with Bernadette's and Jeremy's. However, there were significant differences. Bernadette and Jeremy both testified that Michael had fought with his grandparents hours before the murders; that Michael had said, "I'll kill you" to his grandmother; and that Michael had planned the murders. Michael denied anything more than a slight altercation with his grandparents and denied planning to kill them. Michael did admit to an abstract discussion, between himself, Bernadette, and Jeremy, concerning the best way to kill someone with a knife, and to

bringing knives from the kitchen to his room. Michael also testified that when he saw his grandmother had been stabbed, he went back to his bedroom and covered his head with a pillow.

█ 12 *The Jury Must Not Consider the Consequences of its Verdict.* It is well established that a jury must not consider the consequences of its verdict.

The principle that juries are not to consider the consequences of their verdicts is a reflection of the basic division of labor in our legal system between judge and jury. The jury's function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged. The judge, by contrast, imposes sentence on the defendant after the jury has arrived at a guilty verdict. Information regarding the consequences of a verdict is therefore irrelevant to the jury's task. Moreover, providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion.

*Shannon v. United States,* 512 U.S. 573, 579, 114 S.Ct. 2419, 2424, 129 L.Ed.2d 459 (1994).

13 Jury instructions 14–6006 and 14–6007 assist the court in instructing jurors that they should not consider the consequences of their verdict. UJI 14–6006 NMRA 1997 ([j]ury sole judge of the facts; sympathy or prejudice not to influence verdict); UJI 14–6007 NMRA 1997 ([j]ury must not consider penalty). These instructions assist the jurors in putting aside concerns for the defendant's future and help assure that they rightly "apply the law as stated in [the] instructions to the facts." UJI 14–6006.

14 In New Mexico, "[i]t has long been settled ... that the jury's function is to determine guilt or innocence, not to participate in the imposition of punishment." *State v. Evans,* 85 N.M. 47, 50, 508 P.2d 1344, 1347 (Ct.App.1973); *see also State v. Fero,* 105 N.M. 339, 346, 732 P.2d 866, 873 (1987) (stating the rule that the jury is not to concern itself with the results of the verdict). The effect of the verdict upon the defendant is not the concern of jurors. *Schiff v. Madrid,*

101 N.M. 153, 155, 679 P.2d 821, 823 (1984) (quoting *State v. Ellison*, 19 N.M. 428, 442, 144 P. 10, 14 (1914)).

15 In this case the trial court determined, as a matter of law, that the Consequences of the Verdict Rule would be violated if jurors knew about the number of years Jeremy, as co-conspirator, would serve if he did not plead guilty and was convicted of two counts of first-degree murder, compared to the number of years he hoped to serve having entered into the plea agreement. The court found that from hearing details of the years Jeremy expected to save as a result of the plea, jurors would improperly calculate and consider the time the defendant would serve if convicted. We believe the court's application of the Consequences of the Verdict Rule was proper.

16 It is well established that the trial court has broad discretion in determining which evidence should be admitted and which excluded. *State v. Chambers*, 103 N.M. 784, 714 P.2d 588 (Ct.App.1986). While defendant must have an opportunity to cross-examine concerning bias we find the court's rulings reasonable on the facts of this case.

17 The Consequences of the Verdict Rule is intended to prevent the jury from learning about the consequences to the defendant. In this case, it was not necessary for the jury to consider the full benefit Jeremy received in accepting the plea in order to properly assess any motive he might have had to lie. The trial court properly limited defense counsel's cross-examination while thoughtfully allowing defense counsel an opportunity to reveal bias. The trial court concluded that, following its ruling, defense counsel had an opportunity for "an effective cross-examination, and ... enough information to address the possible bias that the witness may have, and to impeach his credibility." We agree.

18 *Standard of Review.* Defendant correctly acknowledges that the standard of review for limitations on cross-examination is abuse of discretion. *State v. Chambers*, 103 N.M. at 787, 714 P.2d at 591. He urges us to adopt a de novo standard in a case such as this where the court limits cross-examination

as a matter of law. We do not believe the standard should be changed.

19 In *Chambers* the Court held that even in light of a trial court's broad discretion in determining the admission or exclusion of evidence, where the court "exercises its discretion on 'untenable grounds,' the exclusion constitutes an abuse of discretion." 103 N.M. at 787, 714 P.2d at 591. In *Chambers* the trial court incorrectly applied the confidential informant privilege and refused to allow defense counsel an opportunity to cross-examine an informant on the nature of her relationship with the police. The informant was known to the defendant, having been present at the transaction which formed the basis of defendant's indictment. She had also testified at trial. The Court of Appeals found that "whether [the witness's actions] waived the privilege or whether the privilege never applied because defendant always knew the identity of the confidential informant," the identity of informer privilege rule did not provide grounds for the trial court to deny cross-examination. *Id.*

20 *Chambers* is distinguishable from this case in that the defense was entirely precluded from showing the witness's relationship with the State, whereas in this case cross-examination concerning the plea agreement was largely permitted. However, in both *Chambers* and this case the court limited cross-examination as a matter of law. We find abuse of discretion is the proper standard of review in reviewing a limitation placed by the trial court on cross-examination.

21 We conclude that the trial court properly exercised its discretion in this case. The court allowed defense counsel to explore Jeremy's incentive, or motive, to lie. The court might have permitted additional inquiry, but did not abuse its discretion in declining to do so.

22 *Defendant was not denied due process and a fair trial by the prosecutor's statement during closing.* Defense counsel directs us to a misstatement made by the prosecution in its closing argument that "Kelly Fisk told you that she heard Mike Brown say that he planned those murders." Kelly had actually testified that Bernadette told her "that he

[Michael] planned it [the killing of Ed and Marie]." Defense counsel objected to the misstatement and the court sustained the objection. Defense counsel later filed a motion for a new trial based on the misstatement by the prosecutor, which was denied by the court.

 23 This incorrect statement by the prosecutor was improper. We do not find, however, that it deprived the defendant of a fair trial. Where it is alleged that improper prosecutorial comments have been made in closing argument, the question is whether the comments deprive the defendant of a fair trial. *State v. Jett*, 111 N.M. 309, 314, 805 P.2d 78, 83 (1991) (citing *State v. Ruffino*, 94 N.M. 500, 503, 612 P.2d 1311, 1314 (1980)). The general rule is that an isolated comment made during closing argument is not sufficient to warrant reversal. *State v. Landers*, 115 N.M. 514, 517, 853 P.2d 1270, 1273 (Ct.App.1992). We do not find that this isolated misstatement by the prosecutor denied Defendant a fair trial.

24 *Conclusion.* We conclude that the trial court did not err in extending the consequences of the verdict rule to limit cross-examination of a co-defendant concerning the time he expected to save as a result of a plea. We find abuse of discretion is the proper standard of review in reviewing a limitation placed by the trial court on cross-examination. We do not believe the prosecutor's isolated misstatement of testimony denied this defendant a fair trial. For these reasons, the judgment is affirmed.

25 IT IS SO ORDERED.

BACA, MINZNER, and SERNA, JJ., concur.