2008-NMCA-134

193 P.3d 955

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Jim SOSA, Defendant–Appellant.**

No. 26,863.

Court of Appeals of New Mexico.

Aug. 8, 2008.

Certiorari Granted, No. 31,308,
Sept. 22, 2008.

Gary K. King, Attorney General, Santa Fe, NM, M. Anne Kelly, Assistant Attorney General, Albuquerque, NM, for Appellee.

Caren I. Friedman, Santa Fe, NM, for Appellant.

## OPINION

KENNEDY, Judge.

{1} Defendant appeals his convictions on two counts of criminal sexual penetration. The State's theory was that Defendant criminally sexually penetrated Victim while she was incapacitated by drugs or alcohol. We address a prosecutorial misconduct issue and an evidentiary issue. As general background, Victim testified that she believed she was drugged, but no toxicological evidence showed drugs in her system, nor did the jury hear any direct evidence of the administration of drugs to Victim by anyone. However, the State's medical witness testified over objection to what might be the expected effects of date rape drugs and stated that Victim's self-described symptoms were consistent with such effects. Defendant objected to the doctor's testimony about date rape drugs. During rebuttal closing argument, the prosecutor, without objection, told the jury that there was "no evidence of date rape drugs" because the judge would not "allow you to hear" it. There was no evidence of date rape drugs excluded from the jury's consideration by the court. Defendant appeals, asserting cumulative and fundamental error resulting from the improper presentation of evidence before the jury and improper comments by the prosecutor during trial.

{2} We hold that the doctor's testimony about the effects of date rape drugs in general was proper, as was testimony stating that Victim's testimony of her symptoms was consistent with what would be expected from being drugged. However, we agree with Defendant that it was prosecutorial misconduct to tell the jury that there was "no evidence of date rape drugs" because the judge would not "allow you to hear" it. In this trial, any evidence suggesting that Victim was correct in her belief that she had been drugged was of the utmost importance. We therefore conclude that the argument resulted in fundamental error, and we reverse.

## BACKGROUND

{3} Defendant is a personal trainer from Las Cruces, New Mexico who had trained Victim. They had dated and kept in touch to some extent when Victim moved away to Texas. The events that underlie this case began when Victim traveled to El Paso, called Defendant, and arranged to meet him for drinks at a hotel bar in Las Cruces. She picked him up. Later in the evening a friend of Victim's arrived, and they drank more. During the evening, Victim got up to go to the restroom. At that time, Victim testified, she knew she had to stop drinking because of the way she was feeling. Testimony diverges about what happened in the restroom and afterward. Victim testified that the next thing she remembered was sitting on the floor of the restroom unable to move her arms and legs, having a thick tongue, and feeling like she had been drugged. Her friend testified that Victim was talkative all evening, even after throwing up in the rest room, although she was very intoxicated—her speech was slurred, and she was stumbling and talking in circles. The friend testified that Victim was flirting with Defendant, hugging him, and dancing close, which Victim did not recall.

{4} Defendant related that he and Victim went back to his house. She vomited and took a shower, and they went to bed together. Defendant testified that they had some sexual contact short of intercourse. He admitted moving his fingers in and out of her vagina and attempting oral sex, which ended when Victim again began to feel dizzy. After she vomited again, he cleaned up and they went to sleep. Victim testified that she remembered vomiting and being in a shower. She could not recall any other details of that night.

{5} Victim woke up naked in Defendant's bed the next morning. She found her underwear but not her clothes. Defendant explained to her that because of her vomiting the clothes had become soiled, and he was washing them for her. He returned her clothes. Victim went to the bathroom and

noticed blood spotting the toilet paper when she wiped herself. Upon leaving the bathroom, she asked Defendant if anything had happened the night before, and he replied that nothing had happened; he had just taken care of her when she was ill. Victim experienced nausea, a headache, and diarrhea the next day.

{6} Victim left the house, later calling Defendant and offering to buy some cleaning supplies to help with the mess she had made when she became sick. She again asked Defendant if they had sex the night before, and he said no. Defendant testified that he knew Victim wished to remain a virgin until she was married, although he maintained that she engaged in sexual behavior short of intercourse. Victim herself testified on her viewpoint that sexual activity without penile penetration was not intercourse. She testified that she did not ask if they had done anything short of intercourse on that night that they had done in the past.

{7} Victim continued to spot blood and went to see a gynecologist. She was examined by a nurse who was not available to testify at trial, so the State retained Dr. Jana Williams as an expert witness to testify about the nurse's report. Dr. Williams testified that the report described that Victim had a hymenal tear and some bruising that, in her opinion, would result from insertion of a penis or some type of sex object larger than a finger. She testified that women are not usually injured by sexual activity, but that injury is more likely if the woman is not aroused or not conscious. She conceded that the report itself stated "penetration unknown." The defense expert hypothesized that any penetration was digital. The jury acquitted Defendant on Count III, which accused Defendant of penetrating Victim with his penis.

{8} Defendant filed a motion in limine prior to trial seeking to exclude testimony by the State's witnesses about any evidence that Victim had been drugged on the night in question. He maintained that Victim's statement that she believed she had been drugged was prejudicial, irrelevant, based on speculation, and lacked evidentiary foundation. The State responded that Victim could testify about her own perceptions of her physical condition, that she could testify as a lay witness that she felt drugged and did not drug herself, and that for her to testify that she was drugged by another person would be rationally based upon her perception. Furthermore, the State maintained that whether she was drugged was relevant to the element of whether Defendant was aware at the time of the sexual conduct that she was incapable of giving consent.

{9} Prior to trial, the State also disclosed its desire for Victim to testify about a previous occasion at Defendant's house in which he showed Victim what he referred to at that time as tablets of the drug Ecstasy and told her that it heightened sexual pleasure. The State maintained that it was relevant to their previous conversations in which Victim made it clear she wanted to maintain her virginity and establish Defendant's knowledge that she would not consent to intercourse. Defendant objected based on the motion in limine. The prosecutor conceded on excluding arguments that Victim had been drugged with Ecstasy on the night in question but insisted that the previous Ecstasy conversation was part of a pattern of behavior in which Defendant was trying to "push the envelope" with Victim to engage further in sexual involvement. The State also argued that Victim could testify about how she felt that night.

{10} The court's written order following a hearing on Defendant's motion in limine both allowed Victim to testify "as to her own perceptions of her own physical condition and . . . that she felt 'drugged' " and found that "her opinion about someone having surreptitiously drugged her without her consent is rationally based upon her perceptions and therefore is an admissible opinion under Rule 11–701 NMRA." Victim was precluded by this order from testifying as to who she believed had drugged her. The court did not rule on whether any other witness could testify about Victim's perceptions.

{11} On the morning of trial, Defendant moved to limit discussion related to Ecstasy based on irrelevance and prejudice in the absence of any evidence that Victim had taken the drug or had it in her system. In

response to Defendant's raising the issue of the Ecstasy conversation between Defendant and Victim, the court further ruled that Victim could not testify about what the pills that Defendant had shown her might have been but could testify about the conversation in which Ecstasy was mentioned. The State mentioned Ecstasy in its opening statement.

{12} During Dr. Williams' testimony, the State brought up the subject of date rape drugs. Defendant objected, but the court ruled that Dr. Williams was allowed to testify about the effects of date rape drugs. Dr. Williams testified generally about the effects of date rape drugs. Dr. Williams also testified about Victim's symptoms being consistent with the effects of such drugs.

{13} During the State's closing argument, the prosecutor stated: "[Y]ou . . . have heard . . . no testimony about [Victim] being drugged under a date rape drug. And that's right. You heard no expert up here to say that we tested the blood and the urine and found the rape drug." The prosecutor also stated: "[B]asically what you saw today was yet another form of date rape drug, and it was happening right here in the courtroom. When a man needs to describe why he would have done something to that woman, why he would have acted the way he did, he tells them, I was drunk, too. I didn't know what I was doing. That's what this man tried to do right here in the courtroom."

{14} The defense reiterated in its rebuttal closing argument that no evidence of drugs was found. The prosecutor rebutted the statement saying: "[The Defense] says, [n]o evidence of date rape drug. That is wrong. The Judge wouldn't allow things—wouldn't allow you to hear things that you are not allowed to consider as evidence. That wouldn't come in. That's why you get instructed." Defendant did not object to this statement.

## DISCUSSION

### 1. Prosecutorial Misconduct

{15} During the closing argument, Defendant argued that there was no toxicological or scientific evidence that Victim had been drugged. Responding in the rebuttal closing argument, the prosecutor both insinu-

ated to the jury that evidence of date rape drugs did exist and falsely stated that the court had not allowed the jury to consider it. The prosecutor argued: "No evidence of date rape drug. That is wrong. The Judge wouldn't allow things—wouldn't allow you to hear things that you are not allowed to consider as evidence. That wouldn't come in." This statement was misleading.

{16} Where, as here, no objection is interposed to a prosecutor's improper closing arguments, we review for fundamental error. Given our resolution stated later in this opinion on the propriety of expert testimony, we do not find cumulative error as Defendant asserts but "[a] single instance of prosecutorial misconduct . . . so egregious that it may, standing alone, rise to a level of fundamental error and warrant a new trial." *State v. Duffy*, 1998–NMSC–014, ¶ 47, 126 N.M. 132, 967 P.2d 807.

{17} We conclude that the prosecutor's invitation to the jury to consider that there was inculpatory evidence in this case that they had been prevented from hearing is sufficiently improper to rise to that level. Under New Mexico law, it is improper for a prosecutor intentionally to refer to or argue on the basis of facts outside the record. *State v. Ferguson* 111 N.M. 191, 194, 803 P.2d 676, 679 (Ct.App.1990) (*citing* American Bar Association, ABA Standards for Criminal Justice: Prosecution Function § 3–5.9 (2d ed.1980)). It is also improper for a prosecutor to mislead the jury as to the inferences warranted by the evidence. *Ferguson*, 111 N.M. at 194, 803 P.2d at 679 (*citing* Prosecution Function § 3–5.8(a)). Essentially, the prosecutor suggested to the jury that the very evidence he wished had existed— scientific evidence that Victim had been drugged—would have been presented but for a ruling by the court. That statement would constitute misconduct had there been any such suppressed evidence, but the misconduct here is exacerbated because the statement misled the jury to wrongly consider that there was other, more powerful evidence. The problem here was created by the prosecutor's inartful argument, and we resolve any doubt as to its effect in this case in favor of our belief that it likely swayed the

**72**

jury. There was no such evidence and no such ruling by the court. We cannot say that the prosecutor's improper statement did not contribute to Defendant's conviction. *State v. Henderson,* 100 N.M. 519, 522, 673 P.2d 144, 147 (Ct.App.1983) (commenting that improper comments about evidence in a case that amounts to an evidentiary "swearing match" are likely to influence the jury). Consequently, it constitutes extreme prosecutorial misconduct affecting the integrity of the trial process as the verdict likely rests on unsafe ground.

{18} Having determined that there was prosecutorial misconduct, we proceed to consider whether the error is fundamental. This case is not one where the evidence against Defendant is overwhelming. It is a circumstantial case, largely depending on the credibility of the witnesses concerning their actions and intentions on the night in question. The only testing for drugs performed on Victim identified nothing in her system but ibuprofen. Actual evidence of date rape drugs in Victim's system would have been powerful evidence of Defendant's guilt, if such evidence had existed. It is difficult to imagine a worse instance of misconduct than suggesting to the jury that the core scientific evidence proving guilt existed but that the jury had not been allowed to hear it.

{19} The prosecutor, having chosen his course of action, should not now be heard to assert that the action had little effect on the jury.

> The zeal, unrestrained by legal barriers, of some prosecuting attorneys, tempts them to an insistence upon the admission of incompetent evidence, or getting before the jury some extraneous fact supposed to be helpful in securing a verdict of guilty, where they have prestige enough to induce the trial court to give them latitude. When the error is exposed on appeal, it is met by the stereotyped argument that it is not apparent it in any wise influenced the minds of the jury. The reply the law makes to such suggestion is: that, after injecting it into the case to influence the jury, the prosecutor ought not to be heard to say, after he has secured a conviction, it was harmless.

*State v. Rowell,* 77 N.M. 124, 128–29, 419 P.2d 966, 970 (1966).

{20} Because of the magnitude of the misconduct, and because evidence of guilt was not overwhelming, we conclude that the prosecutor's conduct was unwarranted and prejudicial to Defendant's right to a fair trial. *See State v. Bartlett,* 96 N.M. 415, 419, 631 P.2d 321, 325 (Ct.App.1981) (holding that intentionally communicating falsehoods to the jury is inherently prejudicial, the effects of which cannot be erased).

{21} Because there was no objection, we also must consider whether the error is fundamental. *See State v. Allen,* 2000–NMSC–002, ¶ 27, 128 N.M. 482, 994 P.2d 728 (reviewing "certain categories of prosecutorial misconduct that compromise a defendant's right to a fair trial" under the "doctrine of fundamental error"); *State v. Dombos,* 2008–NMCA–035, ¶ 36, 143 N.M. 668, 180 P.3d 675 (same). Fundamental error exists when substantial justice has not been done. *State v. Baca,* 1997–NMSC–059, ¶ 55, 124 N.M. 333, 950 P.2d 776. "An error is fundamental if there is a reasonable probability that the error was a significant factor in the jury's deliberations in relation to the rest of the evidence before them." *State v. DeGraff,* 2006–NMSC–011, ¶ 21, 139 N.M. 211, 131 P.3d 61 (internal quotation marks and citation omitted). In this case, the prosecutor's statement amounted to his testimony that evidence existed that could verify the circumstantial evidence and the victim's opinion when such evidence did not exist. This false statement was uttered to the jury with the State's voice and could only have been calculated to gain advantage with the jury. We cannot say otherwise than that the prosecutor's misconduct constituted error and that there was a "reasonable probability that the error was a significant factor in the jury's deliberations in relation to the rest of the evidence before them." *Id.* This is fundamental error.

{22} Therefore, we reverse Defendant's convictions based on the prosecutor's overreaching, and we remand for a new trial. Issues of what is proper testimony about Victim's self-perceived symptoms and about expert opinions regarding the symptoms will

likely arise upon retrial. We therefore address these issues.

## 2. Expert Testimony and Victim's Symptoms

{23} Defendant's defense in this case was that Victim drank too much and consented to sex. He argued that there was no evidence of a drug and that the police, had they suspected it, could have undertaken other investigations to find traces of drugs. These are matters the jury could properly decide to accept or reject. Although Defendant argues that testimony by Victim about Victim's perception of being drugged was improperly bolstered by Dr. Williams' testimony, we do not consider this to be the case. The testimony of Dr. Williams concerning date rape drugs was properly given and received by the court.

{24} In the course of Dr. Williams' testimony, she was asked if she was familiar with drugs that were colloquially known as "date rape" drugs, and she stated that she was. Defendant objected, arguing that there was no toxicological or scientific basis for Victim's belief that she had been drugged, and that the State was "interjecting a new issue" into the case. The district court exercised its discretion to permit the testimony as long as Dr. Williams was only "talking in general" and to allow Defendant latitude to introduce the toxicology test report showing no indication of date rape drugs if a proper foundation could be laid to introduce the evidence. This was a proper exercise of the court's discretion.

{25} Dr. Williams, in addition to being a medical doctor, has an undergraduate degree in pharmacy. She testified that a date rape drug is a drug typically put in a drink. It will generally not be detected by the person ingesting it because it renders a victim unconscious but leaves the system quickly, before the victim awakes. Dr. Williams also testified that a victim will generally have no memory of what happened. She testified that she would not be surprised that a toxicology report on blood drawn several days after ingesting the drug would have no traces of the drug. She further testified that Victim's symptoms in this case—slurred speech, the feeling of a thickened tongue, and the loss of memory—reinforced a possibility of the involvement of a drug. Defendant's cross-examination concentrated on pointing out that Dr. Williams had not seen the toxicology report and that there were other ways of testing for drugs besides analysis of blood—namely analysis of urine and hair samples or perhaps by testing a person's vomit.

{26} Apart from objecting that the State was attempting to interject a "false" issue into the case, upon which the court gave Defendant latitude to introduce the toxicology report upon cross-examination, Defendant did not otherwise allege that he had been surprised by this testimony or that he needed further relief from the court to address it. From his pretrial motion in limine, the issue of Victim believing that she had been drugged was clearly something about which Defendant was informed and which was the subject of a vigorous defense. As a medical doctor whose undergraduate degree was in pharmacy, we regard Dr. Williams as a qualified expert. *See* Rule 11–702 NMRA (explaining that an expert is a person who by specialized knowledge, skill, training, expertise, or experience can help the trier of fact resolve an issue). No objection was made to Dr. Williams' qualifications to testify about general matters concerning date rape drugs, including why evidence of their presence is difficult to obtain, and we consider Defendant's argument in that regard to be unpreserved. Rule 12–216(A) NMRA. *See State v. Paiz*, 1999–NMCA–104, ¶ 23, 127 N.M. 776, 987 P.2d 1163.

{27} Dr. Williams' opinion went as far as describing typical date rape drug symptoms and stating that they were consistent with what Victim had described. Dr. Williams gave no testimony indicating that Victim was telling the truth or bolstering her statements either on or off the stand. That Defendant argues now that he was surprised by the testimony does not resonate under the circumstances of this case. An expert may testify that symptoms described by an alleged victim of rape are consistent with the administration of a drug to facilitate the attack. *See Sera v. State*, 341 Ark. 415, 17

S.W.3d 61, 79 (2000) (holding that an expert's testimony that a victim's symptoms were consistent with administration of a date rape drug were admissible), *rev'd on other grounds by Sera v. Norris*, 400 F.3d 538 (8th Cir.2005); *see also State v. Nunes*, 260 Conn. 649, 800 A.2d 1160, 1178–80 (2002) (discussing limits on expert testimony concerning date rape drugs). Expert testimony is admissible so long as the expert does not bolster the veracity of the victim nor testify that drugs were the cause of the symptoms to which the victim testified. *State v. Alberico*, 116 N.M. 156, 175–76, 861 P.2d 192, 211–12 (1993). We consequently hold that this testimony was within the bounds of acceptable expert opinion.

{28} Finally, the jury was instructed that Dr. Williams' expert testimony was to be afforded the weight the jury felt it deserved. Defendant did not object to the jury instruction on the elements of the offense concerning a victim who is unconscious, asleep, physically helpless, or suffering a mental condition making her incapable of understanding what her attacker was doing. *See, e.g.*, UJI 14–904 NMRA.

## CONCLUSION

{29} Having completed the trial successfully, and with proper use of Victim's testimony that she felt drugged and of expert testimony about the pharmacology of date rape drugs and their consistency with the symptoms that Victim described, the prosecutor succumbed to the temptation of a final rebuttal argument outside the evidence and outside the bounds of permissible conduct. The error that the prosecutor committed was calculated to influence the jury and was likely an important factor in and had a significant impact on the jury's deliberation. As such, we hold that it rises to fundamental error under *DeGraff*. We reverse Defendant's convictions and remand for a new trial.

{30} **IT IS SO ORDERED.**

I CONCUR: MICHAEL E. VIGIL, Judge.

JONATHAN B. SUTIN, Chief Judge (dissenting in part).

SUTIN, Chief Judge (dissenting in part).

{31} I respectfully dissent in part.

**False Statement**

{32} The majority opinion quotes the statements of the prosecutor it finds objectionable in a short-cut fashion, saying that the prosecutor told the jury in rebuttal that there was " 'no evidence of date rape drugs' because the judge would not 'allow [them] to hear' it." Majority Opinion, ¶¶ 1, 2. The majority opinion then states that this statement was false and misleading because it suggested that scientific evidence of drugging existed. Majority Opinion, ¶¶ 15, 17. The full statement and actual context of the prosecutor was:

Mr. Esparza [defense counsel] says, No evidence of date rape drug. That is wrong. The Judge wouldn't allow things— wouldn't allow you to hear things that you are not allowed to consider as evidence. That wouldn't come in. That's why you get instructed.

So when [Victim] sat there from this bench, from this witness stand and said, I felt like I had never felt before. I felt drugged. That is testimony. You are allowed to consider that.

When Dr. Williams came in and said that all of her statements were consistent with being drugged, you're allowed to consider that.

The foregoing followed two statements by defense counsel that there was "simply no proof" of a date rape drug, and "simply no proof" that "this was a drug-induced incident." When the evidence in the case is considered together with defense counsel's closing argument and the prosecutor's rebuttal, the circumstances do not reflect that any aspect of the prosecutor's statements was false and misleading.

{33} Victim testified that it felt like someone had thrown her in "gel," explaining that "it was just heavy," she could not get her arms to move, her legs were not working, her tongue was heavy and thick, and she could not respond to the questions of her friend, Marcie King. She had never felt like that before. The amount of alcohol she drank

would normally not make her have the next-day symptoms of being "very sick," her body feeling "real achy," her stomach being "extremely nauseous," having diarrhea, and her head hurting. She never had the lack of memory that she experienced that night, and she was "terrified" by her inability to move or talk. She felt as if she had been drugged. Her friend testified that she observed Victim's behavior change "drastically," sliding "downhill" within twenty to thirty minutes. Dr. Williams testified about what can occur from date rape drugs. Thus, there was evidence in the case from which the jury could infer that Victim may have been incapacitated from a drug. Therefore, the defense counsel's closing argument statement that there was "simply no proof" of a date rape drug was incorrect, as the prosecutor correctly noted.

{34} The prosecutor immediately followed with the statement that "the [j]udge . . . wouldn't allow you to hear things that you are not allowed to consider as evidence. That wouldn't come in. That's why you get instructed." Read in full context, one could reasonably conclude that the prosecutor was explaining nothing more than the correct procedure in jury trials that the judge's job is to assure that the jury only hears what it is allowed under the rules to consider as evidence. One could also reasonably conclude that the judge did not in this case exclude evidence that the jury should have heard and thus the evidence the jury heard was properly before it for consideration during its deliberation. One could further reasonably conclude that the judge did not exclude any particular incriminating evidence of which the jury was unaware. There is no indication whatsoever in the record that the prosecutor was specifically suggesting that evidence existed, much less scientific evidence, of which the jury was unaware, that was excluded by the court and that the jury did not hear.

{35} Contrary to the majority's view, even were it possible to construe the prosecutor's statements to indicate exclusion of evidence, there is nothing to indicate that he was referring to exclusion of scientific evidence. There are two strong reasons for this. First,

the evidence in the case and the arguments of counsel to the jury drove home that there were no scientific tests or other scientific evidence showing that any kind of date rape drug was given to Victim. As well, the prosecutor had earlier reminded the jury during his initial closing remarks that "[y]ou heard no expert . . . say that we tested the blood and the urine and found the rape drug." He also informed the jury that Dr. Williams was the only person who testified about a date rape drug, explaining that the drug goes in and out of the system fast "before the woman knows what hit her," that "[t]hey take away . . . memory," and "[t]hat's the way they are used."

{36} Second, the only drug-specific evidence that was excluded by the court was that relating to Victim's having seen at Defendant's house what she believed to be Ecstasy. The court granted a motion in limine forbidding Victim from testifying "as to which person may have surreptitiously drugged her without her consent." Also, as a pretrial matter immediately before trial began, Defendant moved to exclude any testimony regarding Ecstasy, and the court determined that certain testimony regarding Ecstasy would not be permitted. Thus, the only evidence that the court excluded relating to drugging was any discussion of pills Defendant showed her at an earlier time, who specifically may have drugged her, and certain testimony about Ecstasy. The evidence had nothing to do with science.

{37} Based on the foregoing, I see no basis on which to characterize anything the prosecutor said as being false and misleading. Further, to state in an opinion that a lawyer has made a false statement, and particularly to infer as the majority does that the statement was intentionally misleading, is a serious accusation that ought not be made unless the falsity, and particularly an intent to mislead, is clear. I therefore think that the majority is in error in their characterization of the prosecutor's statement.

**Fundamental Error**

{38} Even were it possible to construe the prosecutor's statements as indicating in some manner that the court would not allow drug-related evidence of which the jury was unaware, it is unlikely that the jury was influ-

enced by it in reaching their verdict or, if influenced to some degree, that the test of fundamental error was met. Evidence of Victim's incapacity from either alcohol or drugs or both was strong if not overwhelming. The prosecutor's statement could hardly have been a contributing factor to the verdict.

{39} For all of the foregoing reasons in this dissent, I respectfully cannot agree in the majority's determination to reverse under the fundamental error doctrine.