IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2009-NMSC-056

Filing Date: November 25, 2009

Docket No. 31,308

STATE OF NEW MEXICO,

    Plaintiff-Petitioner and Cross-Respondent,

v.

JIM SOSA,

    Defendant-Respondent and Cross-Petitioner.

ORIGINAL PROCEEDING ON CERTIORARI
Silva E. Cano-Garcia, District Judge

Gary K. King, Attorney General
Martha Anne Kelly, Assistant Attorney General
Santa Fe, NM

for Petitioner and Cross-Respondent

Caren Ilene Friedman
Santa Fe, NM

for Respondent and Cross-Petitioner

OPINION

BOSSON, Justice.

{1}    Jim Sosa (Defendant) was tried and convicted of two counts of sexual assault based on the victim's alleged inability to consent due to alcohol and perhaps drug-related intoxication. The parties hotly contested any suggestion that Defendant might have given the victim a so-called date-rape drug. During closing arguments, the prosecutor made a statement which, according to Defendant, implied that drugging evidence did exist but had been withheld from the jury by the court. Based on that one statement, Defendant claims fundamental error and demands a new trial, or even no trial and a judgment of acquittal, due to prosecutorial misconduct.

1

**{2}**     The Court of Appeals agreed with Defendant, found fundamental error, and reversed the convictions. *State v. Sosa*, 2008-NMCA-134, 145 N.M. 68, 193 P.3d 955. We are not persuaded by Defendant's interpretation of the prosecutor's remark, and we conclude it would not constitute fundamental error in any event. Accordingly, we reverse the Court of Appeals and affirm Defendant's convictions.

**BACKGROUND**

**{3}**     Defendant was charged with three counts of third-degree criminal sexual penetration, which requires proof of "the use of force or coercion." NMSA 1978, § 30-9-11(E) (2005). Force or coercion can be proven by evidence that the accused knew or had reason to know that the victim was "unconscious, asleep or otherwise physically helpless or suffers from a mental condition that renders the victim incapable of understanding the nature or consequences of the act." NMSA 1978, § 30-9-10(A)(4) (2005). The State's theory at trial was that the victim, J.M., was intoxicated by alcohol or a date-rape drug, or both, to such an extent that she was incapable of consenting to sexual activity. Defendant denied giving her a drug of any kind, and maintained that their sexual activity was at all times knowing and consensual.

**{4}**     Defendant and J.M. first met when she hired him as her personal trainer. A relationship developed between them, and over the course of the next two years they would occasionally go out socially for dinner or drinks. At times they engaged in various forms of flirtation and sexual contact, even sleeping together, but avoided penile sexual intercourse.

**{5}**     Thereafter, on the evening of May 24, 2004, J.M. called Defendant and arranged to meet him at a hotel bar in Las Cruces. J.M. consumed a number of drinks throughout the night, to the point where she became heavily intoxicated. J.M. recalled going to the ladies room at the hotel bar with her friend Marcie, where she vomited. She testified that she felt heavy and found it difficult to speak. While she had consumed more alcohol on prior occasions, J.M. insisted that she had never felt as bad or become so drunk; she felt as if she had been drugged. Her friend Marcie testified that J.M.'s behavior changed "drastically" during the night and "she slid downhill" quickly, having trouble sitting up, slurring her words, and even falling over, unaware of her surroundings. J.M. later believed she had been given a date-rape drug that night.

**{6}**     J.M. testified that she did not remember anything between the events at the hotel bar and being in Defendant's shower, vomiting, and then laying on Defendant's bed begging him for a bucket. The next morning she woke up naked in Defendant's bed. She had no recollection of, and Defendant denied, any sexual activity. Detecting some blood spotting, J.M. was examined two days later by a sexual assault nurse who observed bruising, redness and a laceration at the entrance of her vagina, symptoms described at trial as consistent with non-consensual, forced sexual penetration.

2

**{7}** Defendant's recollection differed. He testified that when they arrived at his house, J.M. vomited, took a shower, and then joined him in consensual sexual activity not including penile penetration. The issue at trial, therefore, distilled down to J.M.'s consent, and particularly her ability to consent given her condition that night. The State attacked Defendant's credibility with evidence that he had provided inconsistent statements to the police regarding the events of that night, first denying any sexual activity and then admitting to sexual activity, short of penile penetration, with J.M.'s consent.

**{8}** A toxicology report revealed only ibuprofen in J.M.'s blood. The State's expert testified, however, that date-rape drugs disappear quickly from the blood, suggesting that the negative toxicology report was not conclusive. Throughout the trial, the State continually referred to J.M's condition that night as drunk or drugged.

**{9}** Defendant moved *in limine* to exclude any evidence from trial that J.M. had been drugged. Accommodating Defendant in part, the trial court did not allow J.M. to testify that she believed Defendant had drugged her. However, the court did allow J.M. to describe her own perceptions that night (that she "felt drugged"), and the court allowed expert testimony regarding the effects of date-rape drugs generally. The State's expert, a pediatrician with a degree in pharmacy, testified generally about the nature of date-rape drugs. They are put into the victim's drink, and because they have no taste the victim does not perceive the drug. They cause the victim to lose consciousness, and then the drug passes quickly out of the victim's system making detection difficult. The victim regains consciousness with no memory of events that occurred while under the influence of the drug.

**{10}** During *voir dire*, the prosecutor informed the jury about the State's theory of the case: that J.M. was so incapacitated through drugs or alcohol that she could not consent. Although there would be ample evidence of J.M.'s alcoholic consumption, the prosecutor conceded that there would be no direct evidence of drugging, such as a scientific test. In response, defense counsel's opening remarks stated flatly that there would be "no evidence of any drugging by anybody in the course of this trial."

**{11}** After all the evidence was in and the parties rested, counsel began their closing arguments to the jury. During the State's initial closing, the prosecutor again conceded the absence of any direct evidence of drugging, but reminded the jury of the circumstantial evidence of drugging. Responding, defense counsel attacked the drugging theory by calling it "false," claiming there was "no proof" of drugs, and arguing that all of J.M.'s symptoms were caused by alcohol alone. Counsel told the jury not to consider any evidence of drugging. Thereafter, in the State's rebuttal closing, the prosecutor made the following statement, which is the subject of this Opinion: "[Defense counsel] says, No evidence of date rape drug. That is wrong. The Judge wouldn't allow things--wouldn't allow you to hear things that you are not allowed to consider as evidence. That wouldn't come in." Defendant did not object to the statement or move for a mistrial.

**{12}** The jury convicted Defendant of two counts of third-degree criminal sexual

3

penetration for performing digital penetration and cunnilingus on J.M. when she was incapable of consent. The jury acquitted Defendant of the third count for penile penetration. The court sentenced Defendant to six years imprisonment with three years suspended.

**{13}** After the verdict, Defendant filed a motion for a new trial, asserting *inter alia* a lack of evidence to support the drugging theory. Significantly, Defendant did not assert any error with respect to the prosecutor's closing statement. The motion was denied.

**{14}** On appeal, the Court of Appeals reversed the jury verdict, concluding that the prosecutor's statement was intended to suggest to the jury—inappropriately—that inculpatory evidence of drugging did exist but had been withheld by the court. *Sosa*, 2008-NMCA-134, ¶ 15. The majority found the statement to be "extreme prosecutorial misconduct," amounting to fundamental error, and granted Defendant a new trial. *Id.* ¶ 17. Chief Judge Sutin dissented, observing that the majority had misread the prosecutor's remarks, and that, in any event, those remarks did not undermine the fairness of the verdict and amount to fundamental error. *Id.* ¶¶ 32-39 (Sutin, J., dissenting in part). We granted certiorari to resolve the tension between these opposing views in light of our prior opinions discussing when remarks made during closing argument constitute error.

## DISCUSSION

### The Prosecutor's Comment Did Not Constitute Error

**{15}** We find no error, fundamental or otherwise, in the prosecutor's remark. The entire comment, in full text, was as follows:

> [Defense counsel] says, No evidence of date rape drug. That is wrong. The Judge wouldn't allow things--wouldn't allow you to hear things that you are not allowed to consider as evidence. That wouldn't come in. That's why you get instructed.
> So when [J.M.] sat there from this bench, from this witness stand and said, I felt like I had never felt before. I felt drugged. That is testimony. You are allowed to consider that.
> When Dr. Williams came in and said that all of her statements were consistent with being drugged, you're allowed to consider that.

In the first paragraph of the Court of Appeals opinion, however, the majority recast the comment as: "[T]he prosecutor, without objection, told the jury that there was 'no evidence of date rape drugs' because the judge would not 'allow you to hear' it." *Sosa*, 2008-NMCA-134, ¶ 1. With the statement thus rephrased, the Court of Appeals went on to call it "falsely stated" and "misleading." *Id.* ¶ 15.

**{16}** If one thing is clear to us at the outset, it is that the statement—as paraphrased by the Court of Appeals—is more objectionable than what the prosecutor actually said. If the

4

prosecutor had really told the jury that inculpatory evidence of drugging had been withheld by the court, then we would be faced with a most serious matter indeed. In the absence of a curative instruction, we would be compelled to consider a new trial and perhaps more.[1] But that is not the only interpretation, nor necessarily a reasonable one, of what the prosecutor actually said.

{17} Grammatically, the confusion comes down to which verb tense the reader chooses to apply to the comment as it appears in the transcript. The Court of Appeals, and Defendant on appeal, interpret the prosecutor's remark as utilizing the past tense, thus reading "the judge *wouldn't* allow you to hear things" as "the judge *didn't* allow you to hear things." To Defendant, the only logical inference is that there were things about drugs to be heard, and the judge prevented the jury from hearing them.

{18} Our reading, however, is that the prosecutor was referring to the evidence the judge *did* admit, not to matters the judge *did not* admit. The prosecutor used the negative contraction "wouldn't" in the sense that a judge would not allow "things" into evidence if the court did not intend the jury to consider them as evidence. *See* Mary E. Whitten, et al., *Hodges' Harbrace College Handbook* 564 (11th ed. 1990) ("would" as a modal auxiliary verb shows determination, promise, or intention). In other words, by allowing testimony of drugging—such as J.M.'s perception that she felt drugged—the judge intended the jury to consider that testimony as evidence and give it appropriate weight.

{19} We understand, of course, that closing argument is inherently conversational, and on this appeal we review the cold, written record without the benefit of any audio record of what was said. Like the Court of Appeals, we cannot listen to the words—along with inflection—as spoken by counsel at trial. The point we make is that Defendant's interpretation of the transcript does not stand alone. It is not the only reasonable way to comprehend what the prosecutor said, and it certainly is not a grammatically favored interpretation. Perhaps an audio recording would have clarified the matter. But in the absence of such additional evidence, it seems superficial to assume that Defendant must be right and the State must be wrong, based on what little we have on appeal.

{20} Our primary concern is what the jury understood the comment to mean, and grammar aside, several aspects of the trial support our interpretation of the prosecutor's remarks. First, defense counsel did not object to the prosecutor's statement. If the prosecutor's inflection were such that the past tense was so apparent (meaning, the judge *didn't* allow you to consider evidence of drugging but it does exist), then we would have expected some

---

[1]Defendant argues there should be no retrial because the prosecutor's remark was so outrageous that it falls within the rare circumstance we have recognized as prosecutorial misconduct, barring a new trial on the basis of double jeopardy. Because we do not find reason for a new trial, we need not consider the double jeopardy issue. *See State v. Breit*, 1996-NMSC-067, ¶ 14, 122 N.M. 655, 930 P.2d 792.

reaction from defense counsel—a seasoned criminal defense attorney—who vigorously fought throughout the trial to silence the prosecution on the subject of drugs. Why now, moments before the end of the trial, would counsel sit mute and allow the jury to be contaminated by a suggestion that such evidence existed but had been withheld by the court?

{21}    Second, even such a comment were to escape defense counsel's attention, we would expect the trial judge to intervene with a warning to counsel or a curative instruction if, in fact, the comment were as prejudicial as Defendant now suggests. Yet in this case the court did not react to the statement.

{22}    Finally, and most tellingly, defense counsel—even after time for reflection— made no mention of this supposedly prejudicial remark in his motion for a new trial. That motion alleged several improprieties with respect to the State's drugging theory, but nothing about statements made in closing argument.  We find it highly improbable that prosecutorial misconduct of the worst sort, as the Court of Appeals found, would evade all but the jury until well into the appellate process.  It is far more likely that the comment was not understood by the jury or by anyone else to mean what Defendant now suggests.

{23}    We think the prosecutor was simply responding to defense counsel's closing argument—an appropriate use of rebuttal—and counsel's claim that  there was "no proof" of a date-rape drug.  The prosecutor prefaced her comment with an explicit reference to defense counsel's statement in closing ("[Defense counsel] says, No evidence of date rape drug. That is wrong.").  The prosecutor followed that comment with an explanation that testimony admitted at trial is, in fact, evidence of drugging that a jury may consider.  In contrast, Defendant's interpretation only makes sense when the statements are removed from the context of the prosecutor's broader argument.

**Error in Closing Statements—Our Precedent**

{24}    Closing argument is unique.  Coming at the end of trial, and often after jury instructions, it is the last thing the jury hears before retiring to deliberate, and therefore has considerable potential to influence how the jury weighs the evidence. At the same time, closing argument, and rebuttal argument in particular, is necessarily responsive and extemporaneous, not always capable of the precision that goes into  prepared remarks.

{25}    At the trial level, courts strike a balance between these competing considerations by affording counsel reasonable latitude in their closing statements, and by instructing the members of the jury that they are to base their deliberations only on the evidence along with instructions from the court, and not on argument from counsel. *See State v. Taylor*, 104 N.M. 88, 94, 717 P.2d 64, 70 (Ct. App. 1986); *State v. Henderson*, 100 N.M. 519, 521-22, 673 P.2d 144, 146-47 (Ct. App. 1983).  Additionally, a trial court can correct any impropriety by striking statements and offering curative instructions.  And should all the preceding safeguards fail, the trial court retains the power to declare a mistrial. Because trial judges are in the best position to assess the impact of any questionable comment, we afford

6

them broad discretion in managing closing argument. *See State v. Chamberlain*, 112 N.M. 723, 729, 819 P.2d 673, 679 (1991) (district courts are given wide discretion in controlling closing statements, and a reviewing court will not find reversible error absent an abuse of discretion). Only in the most exceptional circumstances should we, with the limited perspective of a written record, determine that all the safeguards at the trial level have failed. Only in such circumstances should we reverse the verdict of a jury and the judgment of a trial court.

**{26}** Where error is preserved at trial, an appellate court will review under an abuse of discretion standard. *State v. Duffy*, 1998-NMSC-014, ¶ 46, 126 N.M. 132, 967 P.2d 807. Where counsel fails to object, the appellate court is limited to a fundamental error review. *Id.* In both instances, however, the reviewing court must determine whether the relative weight of the error meets the threshold required to reverse a conviction. We have reviewed over 30 years of appellate decisions regarding challenges to closing arguments under both standards of review, and we discern three factors that appear to carry great influence in our deliberations: (1) whether the statement invades some distinct constitutional protection; (2) whether the statement is isolated and brief, or repeated and pervasive; and (3) whether the statement is invited by the defense. In applying these factors, the statements must be evaluated objectively in the context of the prosecutor's broader argument and the trial as a whole.

**{27}** With respect to the first factor, our courts have been most likely to find reversible error when the prosecution's comment invades a distinct constitutional protection. In *State v. Ramirez*, 98 N.M. 268, 269, 648 P.2d 307, 308 (1982), the prosecutor stated in closing, "Nowhere during this period of time does this [d]efendant come forward and most of all, nowhere does he come forward and produce the gun that can acquit him or maybe show he didn't fire the fatal shot." We held that reference to a defendant's post-*Miranda* silence violated the constitution, and constituted reversible error despite defense counsel's failure to object. *Id.*; *see also State v. Allen*, 2000-NMSC-002, ¶ 27, 128 N.M. 482, 994 P.2d 728 (filed 1999); *State v. Clark*, 108 N.M. 288, 303, 772 P.2d 322, 337 (1989), *disapproved of on other grounds by State v. Henderson*, 109 N.M. 655, 659, 789 P.2d 603, 607 (1990).

**{28}** Similarly, in *Garcia v. State*, 103 N.M. 713, 714, 712 P.2d 1375, 1376 (1986), the prosecutor made repeated reference to the defendant's failure to consent to a warrantless search. Comparing the Fourth Amendment right to refuse entry to a police officer with the Fifth Amendment right to silence, we held that the prosecutor's comment placed an "unfair and impermissible burden" on the defendant's exercise of his Fourth Amendment rights, which had "an obvious and extreme prejudicial impact [requiring] reversal." *Id.* (quoting *United States v. Prescott*, 581 F.2d 1343, 1351 (9th Cir. 1978)).

**{29}** The second factor we consider is whether the challenged statement was only brief and isolated. Extensive comment is more likely to cause error, whereas "[t]he general rule is that an isolated comment made during closing argument is not sufficient to warrant reversal." *State v. Brown*, 1997-NMSC-029, ¶ 23, 123 N.M. 413, 941 P.2d 494. In

*Henderson*, 100 N.M. at 522, 673 P.2d at 147, a sexual assault case, we found reversible error where the prosecutor indulged in a "true story" about a man who was acquitted of rape, and went on to commit several more rapes before being caught. Defense counsel repeatedly objected and the court admonished the jury to disregard the story, but the court did not declare a mistrial. *Id.* at 521, 673 P.2d at 146. Our Court of Appeals reversed because it was an exceedingly close case with little evidence, and the prosecutor's "story" was "lengthy, not based on evidence, and served no purpose other than to arouse prejudice against the defendant." *Id.* at 522, 673 P.2d at 147.

**{30}** The Court of Appeals also found reversible error in *State v. Diaz*, 100 N.M. 210, 213-14, 668 P.2d 326, 329-30 (Ct. App. 1983), where the prosecutor made several, separate remarks in closing regarding his authority to represent the State, invoking an impermissible inference that the State and the jury were engaged in a joint enterprise to fight crime. The court concluded, "'we have not here a case where the misconduct of the prosecuting attorney was slight or confined to a single instance, but one where such misconduct was pronounced and persistent, with a probable cumulative effect upon the jury.'" *Id.* at 215, 668 P.2d at 331 (quoting *Berger v. United States*, 295 U.S. 78, 89 (1935)).

**{31}** In contrast, our appellate courts have consistently upheld convictions where a prosecutor's impermissible comments are brief or isolated. In *State v. Landers*, the prosecutor stated in closing, "keep in mind that child abuse is something that must be stopped," and after objection, "sexual abuse must be stopped on [the victim]." 115 N.M. 514, 517, 853 P.2d 1270, 1273 (Ct. App. 1992) (alteration in original) (internal quotation mark omitted), *overruled on other grounds by State v. Kerby*, 2005-NMCA-106, 138 N.M. 232, 118 P.3d 740. The nature of the comments in *Landers*—an impermissible appeal to fight crime—was not unlike that of the comments in *Diaz*.

**{32}** The difference is that in *Diaz* the prosecutor's repeated remarks served to impress upon the jury that their interests were shared with the prosecution. 100 N.M. at 214, 668 P.2d at 330. The conclusion in *Diaz* was that the prosecutor had already weighed the evidence on behalf of the state and determined guilt. Such a conclusion could only be the result of a calculated, pervasive theme. As illustrated in *Landers*, the same conclusion is much more difficult to draw from a brief or isolated comment. *See Allen*, 2000-NMSC-002, ¶¶ 97-100 (single improper comment in closing not fundamental error in broader context of closing argument); *Duffy*, 1998-NMSC-014, ¶ 51 (holding that the defendant was not deprived of a fair trial when an improper statement was not emphasized by the prosecution).

**{33}** Turning to the third factor, we are least likely to find error where the defense has "opened the door" to the prosecutor's comments by its own argument or reference to facts not in evidence. *Id.* ¶ 56; *Taylor*, 104 N.M. at 94, 717 P.2d at 70. In *State v. Smith*, 2001-NMSC-004, ¶ 5, 130 N.M. 117, 19 P.3d 254, the defendant was charged with murder after she and three other defendants drove the victim outside of town and shot him several times. Defense counsel stated in opening that the defendant remained seated in the vehicle while the others committed the murder. *Id.* ¶ 37. No such evidence was presented at trial. *Id.* In

closing, the prosecutor said that the defendant was not seated in the vehicle while the murder occurred, and commented on the lack of any testimony suggesting otherwise. *Id.* The defendant objected that the prosecutor had impermissibly referred to her silence. *Id.* We declined to reverse the conviction, concluding that the comments were invited by the defendant's opening remarks. *Id.* ¶¶ 39-40; *see also State v. Henry*, 101 N.M. 266, 267, 681 P.2d 51, 52 (1984) (closing statements regarding the defendant's right to silence were permissible because invited by defendant's opening statements); *State v. Rojo*, 1999-NMSC-001, ¶¶ 54 n.3, 56, 126 N.M. 438, 971 P.2d 829 (filed 1998) (prosecutor's comment, "[h]e did not look you in the eyes and say, 'I did not kill [the victim],'" were responsive to defense closing argument, and permissible comment on the character of a witness (the defendant)).

**{34}** These three factors are useful guides, but in the final analysis context is paramount. Where evidence of guilt is overwhelming, or an improper statement is corrected by counsel or the court, reversible error is less likely. If a case turns on a crucial fact that is improperly manipulated in closing, or if counsel persists when admonished to desist, the probability of error is greater. The possible combination of circumstances is myriad. But the common thread running through the cases finding reversible error is that the prosecutors' comments materially altered the trial or likely confused the jury by distorting the evidence, and thereby deprived the accused of a fair trial.

**A Review Under the Fundamental Error Standard Reinforces Our Holding**

**{35}** While we find no error in the prosecutor's comment, given the Court of Appeals' discussion, we find it necessary to explain why, even if the comment was erroneous, it falls short of fundamental error. Fundamental error occurs when prosecutorial misconduct in closing statements compromises a defendant's right to a fair trial, and we will reverse a conviction despite defense counsel's failure to object. *Rojo*, 1999-NMSC-001, ¶ 55. To find fundamental error, we must be convinced that the prosecutor's conduct created "a 'reasonable probability that the error was a significant factor in the jury's deliberations in relation to the rest of the evidence before them.'" *State v. DeGraff*, 2006-NMSC-011, ¶ 21, 139 N.M. 211, 131 P.3d 61 (quoting *Clark*, 108 N.M. at 303, 772 P.2d at 337). As with any fundamental error inquiry, we will upset a jury verdict only (1) when guilt is so doubtful as to shock the conscience, or (2) when there has been an error in the process implicating the fundamental integrity of the judicial process. *State v. Barber*, 2004-NMSC-019, ¶ 16, 135 N.M. 621, 92 P.3d 633.

**{36}** In discussing the fundamental error standard of review, the Court of Appeals stated, "we resolve any doubt as to [the statement's] effect . . . in favor of our belief that it likely swayed the jury. . . . We cannot say that the prosecutor's improper statement did not contribute to Defendant's conviction." *Sosa*, 2008-NMCA-134, ¶ 17. The appellate court's presumption of fundamental error is incorrect. To presume prejudice wherever there is error would turn our fundamental error jurisprudence on its head, shifting the burden on appeal to the State to prove that *no* fundamental error occurred.

9

**{37}** Under the proper standard, we begin with the presumption that the verdict was justified, and then ask whether the error was fundamental. *See Allen*, 2000-NMSC-002, ¶ 95; *Rojo*, 1999-NMSC-001, ¶ 55. In the case before us, even if we were to assume that the prosecutor's comment was error, the principles we outlined above warrant a different conclusion from what the Court of Appeals decided.

**{38}** To begin the analysis, the prosecutor's comment did not invade any distinct constitutional protection of the sort we condemned in *Ramirez*, 98 N.M. at 269, 648 P.2d at 308, and *Garcia*, 103 N.M. at 714, 712 P.2d at 1376. Absent a constitutional violation, we look at the length and repetition of the comment to determine whether it was so pervasive as to clearly distort the body of evidence before the jury. *See Brown*, 1997-NMSC-029, ¶ 23. At its worst, the comment was brief and singular. It was not repeated, nor was it a return to an impermissible theme from before. The comment was a far cry from the long, detailed story we saw in *Henderson*. Our view might be different had defense counsel objected at trial, but he did not.

**{39}** Turning to the third factor in our analysis, the prosecutor's statement was clearly in response to defense counsel's remarks. The prosecutor began with "[Defense counsel] says, No evidence of date rape drug. That is wrong." Defense counsel had argued in closing that the State's drugging theory was "a very false issue," and that there was "simply no proof of it." In fact, as the parties concede, several items of circumstantial evidence arguably supported a drugging theory. Under the circumstances, the prosecutor was almost compelled to respond. Having opened the door, Defendant cannot now split semantic hairs over the prosecutor's choice of words. *See State v. Chacon*, 100 N.M. 704, 706-07, 675 P.2d 1003, 1005-06 (Ct. App. 1983) (no fundamental error where prosecutor's error was limited to one improper word, and the defendant had opened the door to the comment); *see also State v. Ruffino*, 94 N.M. 500, 503, 612 P.2d 1311, 1314 (1980) ("That the prosecutor can refer to the defendant's failure to testify if the door is opened by the defense, is well supported by case law.").

**{40}** What also sets this case apart is the overwhelming evidence of J.M.'s state of extreme intoxication that night, whether through alcohol or drugs, and the State's repeated argument at trial that intoxication by alcohol alone was sufficient to impair J.M.'s ability to consent. Defendant did not dispute much of the evidence going to alcohol intoxication; his theory was that J.M. was capable of consenting and did consent to the sexual contact. Defendant admitted to certain sexual acts, and the jury only convicted him of the charges that were based on the acts he conceded. The State also produced circumstantial evidence to suggest its drugging theory, and physical evidence to support the idea that J.M. did not willfully participate in sexual activity that night. Not to be underestimated, the evidence also showed Defendant making inconsistent statements to both J.M. and the police about what occurred that night.

**{41}** Our discussion highlights the importance of adhering to the fundamental error standard of review. It is undoubtedly possible that the jury heard the statement as Defendant

suggests, but we cannot say as a matter of law that the probability is so great that a miscarriage of justice will result without our intervention.  We conclude that there was no error at all, but more importantly, our obligation is to assume there was no error until Defendant satisfies his burden of persuasion by showing otherwise.  In light of the overwhelming evidence of guilt, the context of the statement, and Defendant's failure to alert the judge to any error during trial, we decline to take the extraordinary action of upsetting the jury's verdict.

**CONCLUSION**

**{42}**    We reverse the opinion of the Court of Appeals and affirm the judgment of the district court below.

**{43}    IT IS SO ORDERED**.


_____
**RICHARD C.  BOSSON, Justice**

**WE CONCUR:**


_____
**EDWARD L. CHÁVEZ, Chief Justice**


_____
**PATRICIO M. SERNA, Justice**


_____
**PETRA JIMENEZ MAES, Justice**


_____
**CHARLES W. DANIELS, Justice**

**Topic Index for _State v. Sosa_, No. 31,308**

| **AE** | **APPEAL AND ERROR** |
|---|---|
| AE-FE | Fundamental Error |

| **CT** | **CONSTITUTIONAL LAW** |
|---|---|
| CT-MS | Misconduct by Prosecutor |

| **CL** | **CRIMINAL LAW** |
|---|---|
| CL-IX | Intoxication |
| CL-SX | Sexual Offenses |

**CA**             **CRIMINAL PROCEDURE**
CA-CG             Closing Argument
CA-MP             Misconduct by Prosecutors