This decision of the Supreme Court of New Mexico was not selected for publication in the New Mexico Appellate Reports.  Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions.  Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Supreme Court.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Filing Date:  January 8, 2021**

**No. S-1-SC-37856**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**YOAN PENA SANTIESTEBAN,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Brett R. Loveless, District Judge**

Bennett J. Baur, Chief Public Defender
Caitlin C.M. Smith, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Hector H. Balderas, Attorney General
Anne E. Minard, Assistant Attorney General
Santa Fe, NM

for Appellee

**DECISION**

**VIGIL, Justice.**

**{1}** Mr. Severinghaus was shot and killed on the morning of May 26, 2017. Mr. Santiesteban (Defendant) was later convicted of his murder along with other crimes and sentenced to life in prison plus sixty-eight years and six months. On appeal, Defendant argues that his conviction is improper for three reasons. First, he argues that the district court should have granted a mistrial when the State's primary witness, Defendant's ex-girlfriend, improperly testified about Defendant's other murder charges. Second, Defendant argues that the district court erred in admitting polygraph evidence of the

State's primary witness. Third, Defendant argues that his conviction violates double jeopardy and that a firearm enhancement was improperly added to his sentence.

**{2}**     Our analysis of Defendant's first two arguments leads us to conclude that the district court did not abuse its discretion in either ruling. However, we agree that Defendant's sentence is improper for both of the reasons set forth by Defendant. Therefore, we affirm Defendant's conviction for the murder of Mr. Severinghaus but vacate his conviction for shooting at a motor vehicle and his one-year firearm enhancement.

## I.      BACKGROUND

**{3}**     Defendant and his ex-girlfriend, Gloria Chavez, were charged with committing multiple murders in May of 2017. Ms. Chavez signed a plea agreement and agreed to testify against Defendant. Defendant's murder charges were severed for trial. Defendant's first murder trial ended in a hung jury. Defendant's second murder trial, for the death of Mr. Severinghaus, lasted two weeks and resulted in a guilty verdict.

**{4}**     During Defendant's second trial, the evidence revealed the following. At approximately 6:00 a.m. on the morning of May 26, 2017, Mr. Severinghaus left his house for work. Just after starting his car in the driveway, he was shot and killed. Mr. Severinghaus's mother testified that from inside the house, she heard "two very loud popping sounds." She looked out the window and saw a thin Hispanic man who was "[a]bout medium height, wearing gray cargo shorts, [a] dark T-shirt, [and a] baseball cap, dark gray." She saw the man get into a small, white car and drive away. Mr. Severinghaus's mother then ran to her son, who was bleeding profusely and lying face down in the driveway. Mr. Severinghaus died at the scene shortly thereafter.

**{5}**     The Severinghaus's neighbor, Ms. Fachini, also testified that while walking in the neighborhood around the same time that morning, she spotted a small, white car parked in the middle of the street. She said that she heard three gunshots before watching a man drive away in the white car. She said the man looked slender and wore a gray-brown colored t-shirt. A second neighbor, Ms. Marshall, testified similarly saying that she was awakened by three loud bangs. Ms. Marshall's home surveillance camera also captured a white car driving by the house around the same time.

**{6}**     An autopsy later revealed three bullet tracks through Mr. Severinghaus's neck, chest, and back. The forensic pathologist testified that there was evidence of gunpowder stippling on his face, which indicated that he was shot at intermediate range. Ultimately, Mr. Severinghaus's cause of death was gunshot wounds to the neck and torso, which caused severe blood loss.

**{7}**     Later that morning, Defendant went to Wells Fargo bank in Albuquerque claiming to be Mr. Severinghaus and asked to change the PIN on his bank card. A suspicious bank employee called the police who arrested Defendant. Defendant told police that he had found Mr. Severinghaus's wallet on the side of the road and admitted to trying to use his bank card and identification but denied any involvement in his death.

Nevertheless, Defendant was indicted for the death of Mr. Severinghaus and was tried by a jury for first-degree murder.

**{8}** As was part of Ms. Chavez's plea agreement, she testified for the State during Defendant's trial. Ms. Chavez's version of events around the time of the crime went as follows. She and Defendant were together at a casino on the evening of May 25, 2017, the night before Mr. Severinghaus died. After the casino closed at 5:30 a.m. on May 26, 2017, they had sex in his car in the parking lot and then drove around town. She stated that they planned to steal something but did not specify what. She stated that Defendant drove them around a neighborhood that she did not recognize before stopping at Mr. Severinghaus's house. Ms. Chavez recalled that Defendant "got out of the car and walked straight to the driver's side door and just started shooting at [Mr. Severinghaus]." Defendant then grabbed Mr. Severinghaus's wallet and came back to the car. He then took a rag from his car and wiped down the door of Mr. Severinghaus's car. Ms. Chavez said that when they were unsuccessful at using Mr. Severinghaus's bank card at an ATM and changing his PIN over the phone, they went home, changed clothes, and then went to the bank where Defendant pretended to be Mr. Severinghaus.

**{9}** Ms. Chavez also testified that she and Defendant used methamphetamine and delivered drugs together. In response to defense counsel's questioning on cross-examination, Ms. Chavez said that her drug use affected her memory. On redirect examination, the State questioned Ms. Chavez on the clarity of her memories:

| | |
|---|---|
| State: | Your testimony yesterday to defense counsel was that you lost track of time at some points around May 26th, 2017. Do you remember that testimony? |
| Ms. Chavez: | Yes, sir. |
| State: | Why was that? |
| Ms. Chavez: | Just because I was high and playing at the casino. I don't really remember too much of time. |
| State: | Are there events regarding that time frame that are clear in your memory? |
| Ms. Chavez: | Yes, sir. |
| State: | Why is it that some of those memories are clearer? |
| Ms. Chavez: | Because they were so sad. I don't know what you mean. Sorry. |
| State: | Well, let's talk about that. Because they're so sad. The ones that stick out in your memory because they're so sad, what are you referring to exactly? |
| Ms. Chavez: | *Like, lifes were tooken* [*sic*]. |
| | …. |

| State: | The events that stand out most to you, would it be fair to say they're the events related to the crimes that happened at this time? |
|---|---|
| Ms. Chavez: | Yes, sir. |

(Emphasis added.) Defendant later moved for a mistrial arguing that Ms. Chavez's testimony that "lifes were tooken [sic]," was an improper reference to the other murders that Defendant was indicted for. The district court found no basis for the mistrial as there was no information presented to the jury to suggest that Ms. Chavez was talking about the other deaths and further, the prosecutor did not intentionally elicit the statement. Therefore, the district court denied the motion for mistrial.

**{10}** To strengthen Ms. Chavez's credibility, the State introduced testimony from a polygraph examiner who stated that he performed a polygraph examination on Ms. Chavez. The polygraph examiner testified that he asked Ms. Chavez three questions regarding whether, at the time of the murder, she ever left the car or touched Mr. Severinghaus's car. She responded that she had not, and the polygraph examiner concluded that she was telling the truth. He testified that there was only a ten percent chance that she was misleading him.

**{11}** Defense counsel objected to the polygraph examiner's testimony arguing that the testimony should be excluded because polygraphy is not "generally accepted as a field of science in the courts" and is not "accepted around the country, other than in New Mexico." The judge overruled this objection and admitted the testimony.

**{12}** At the conclusion of the trial, the jury returned a guilty verdict for first-degree murder, aggravated burglary, armed robbery, shooting at a motor vehicle resulting in great bodily harm, identity theft, and conspiracy to commit burglary and fraud. Defendant was sentenced to life in prison plus sixty-eight years and six months. Defendant directly appealed his convictions to this Court pursuant to Article VI, Section 2 of the New Mexico Constitution.

## II.   DISCUSSION

### A.   Standard of Review

**{13}** On appeal, Defendant argues that the district court erred by refusing to grant a mistrial due to improper witness testimony and by admitting polygraph evidence. Because both issues were preserved at trial (one through a motion for mistrial and the other through an objection), we review these issues for abuse of discretion. *See* Rule 12-321(A) NMRA; *State v. Sosa*, 2009-NMSC-056, ¶ 26, 147 N.M. 351, 223 P.3d 348 ("Where error is preserved at trial, an appellate court will review under an abuse of discretion standard.").

**{14}** This Court "must determine whether the relative weight of the error meets the threshold required to reverse a conviction." *Sosa*, 2009-NMSC-056, ¶ 26. "We will find

an abuse of discretion if a court's ruling is clearly untenable or contrary to logic and reason. Additionally, a court abuses its discretion if it applies an incorrect standard, incorrect substantive law, or its discretionary decision is premised on a misapprehension of the law." *State v. Sena*, 2020-NMSC-011, ¶ 15, 470 P.3d 227 (internal quotation marks and citation omitted). With this high standard in mind, we proceed to the issues presented by Defendant.

## B.    Ms. Chavez's Testimony

**{15}**    The first issue is whether the district court abused its discretion when it denied Defendant's motion for mistrial after the State's primary witness testified, "lifes were tooken [sic]." Defendant argues that Ms. Chavez's testimony referred to Defendant's other murder charges and therefore violated the agreement that neither party was permitted to introduce evidence of his other murder charges at Defendant's trial for the Severinghaus murder.

**{16}**    Defendant insists that Ms. Chavez's statement that "lifes were tooken [sic]" required the district court to grant a mistrial because the prosecutor intentionally elicited disallowed testimony. Defendant says the prosecutor demonstrated this when he asked a question that called for inadmissible testimony and then re-asked the question after the witness hesitated by saying, "I don't know what you mean. Sorry." Defendant criticizes that rather than generally asking about "events regarding that time frame," which Ms. Chavez could have interpreted to include the other murders, the prosecutor should have asked more specifically about just Mr. Severinghaus's death. Defendant parallels this case to *State v. Ruiz,* where the Court of Appeals held that the prosecutor improperly elicited inadmissible testimony when he could not later explain what he was expecting the witness to say in answer to his question. 2003-NMCA-069, ¶¶ 7, 11, 133 N.M. 717, 68 P.3d 957. Defendant says that this case is similar because both contain a pattern of questioning that shows that the state intended to elicit comments.

**{17}**    We note, however, that in the *Ruiz* case, it was more obvious that the prosecutor improperly elicited inadmissible testimony. In that case, "the witness was trying to avoid improper reference." *Id.* ¶ 8. "The witness exhibited an awareness that what he was trying to say was forbidden." *Id.* The witness even tried to clarify with the prosecutor, "you want me to say what he said?" *Id.* Still, the prosecutor continued on the same line of questioning. *Id.* ¶ 7-8. After weighing the evidence as a whole, the *Ruiz* Court could not "say that the erroneous [testimony] did not contribute to [defendant's] conviction." *Id.* ¶ 11.

**{18}**    Defendant next argues that regardless of whether the prosecutor intentionally elicited Ms. Chavez's statement, it required a mistrial because of how prejudicial it was to Defendant's theory of innocence. Defendant argues that Ms. Chavez's statement that "lifes were tooken [sic]" had a reasonable probability of affecting the jury's verdict because it could have planted the idea that Defendant perhaps killed other people as well. Defendant stresses that the problem with the statement was not that it was false but that it potentially reflected something that was true as Defendant was in fact charged with other murders. For this reason, Defendant says that a curative instruction,

correcting the accuracy of the witness's statement, which is sometimes enough to overcome an error like this, was not an option in this case. Therefore, the only way to cure the error was to grant a mistrial.

**{19}** The State disagrees arguing that not only was the court well within its discretion but the statement itself was so harmless that it likely did not affect the verdict in this case. The State asserts that Ms. Chavez's statement that "lifes were tooken [sic]" was too ambiguous and unintelligible to have any impact on the jury. In denying the motion for mistrial, even the judge commented,

> [T]he impression I was getting was that she was mixing up her plural with singular. . . I don't even know that the jury would draw or could draw any inference that there were additional things. I just think it's too speculative[.]
>
> . . . .
>
> [A]t a minimum, in order to grant a mistrial, I would have to, at least, believe that she was talking about the larger context of this case, the multiples, and I don't even know what she was saying.

**{20}** The State reassures us that any improper inference the jury may have drawn from Ms. Chavez's statement was minimized when it was given no emphasis during the trial. The State recounts that defense counsel did not immediately object to the comment and the prosecutor who was questioning Ms. Chavez "seamlessly" moved on to the next question without fixating on what the witness had just said.

**{21}** We observe, however, that the prosecutor did not immediately move away from this line of questioning. A few moments after Ms. Chavez said, "lifes were tooken [sic]," the prosecutor followed up with, "The events that stand out most to you, would it be fair to say that they're the events related to the *crimes* that happened at this time?", to which Ms. Chavez replied, "Yes, sir." (Emphasis added.) Following up with a question mentioning "crimes" may have drawn slightly more attention to the inappropriate witness testimony. Though this was an ill-advised question on the part of the prosecutor, it is not enough to show that he intentionally elicited improper testimony.

**{22}** In order to side with Defendant on this issue, we must be able to discern what exactly Ms. Chavez was referring to when she said, "lifes were tooken [sic]." We can guess that she was referring to the other murders, but she could have also been referring to other violence that she was surrounded by due to her circumstances. Even defense counsel noted in his motion for mistrial that it is possible that the jury perceived the statement in the context of Ms. Chavez's previous testimony regarding witnessing violence in her own neighborhood.

**{23}** Regardless, considering the statement within the larger context of the case leads us to conclude that the three words, "lifes were tooken [sic]," did not have much influence on the jury. The abundance of evidence against Defendant including three

eyewitnesses suggests that even if Ms. Chavez's statement had some impact, the jury likely would have reached the same conclusion irrespective of her comment.

**{24}** It is clear that here "the relative weight of the error" in the witness's comment does not "meet[] the threshold required to reverse a conviction." *See Sosa*, 2009-NMSC-056, ¶ 26. The district court's ruling in denying a mistrial was not an abuse of discretion because it was not "clearly untenable or contrary to logic and reason." *See Sena*, 2020-NMSC-011, ¶ 15 (internal quotation marks and citation omitted). In fact, as the judge could not decipher the meaning behind the witness's statement, it was reasonable to allow the trial to proceed to verdict. The district court exercised proper discretion when it denied Defendant's motion for mistrial.

## C. Polygraph Evidence

**{25}** The second issue before us is whether the district court abused its discretion when it allowed the State to admit polygraph evidence. Defendant argues that it was improper for the court to admit the State's "polygraph evidence to bolster the credibility" of Ms. Chavez's testimony.

**{26}** Rule 11-707(C) NMRA explicitly allows polygraph evidence: "A polygraph examiner's opinion as to the truthfulness of a person's answers in a polygraph examination may be admitted." Further, in New Mexico Supreme Court case, *Lee v. Martinez*, 2004-NMSC-027, ¶ 11, 136 N.M. 166, 6 P.3d 291, we acknowledged that polygraph testimony is permitted in New Mexico courtrooms. ("[A]dmission of expert testimony or other scientific evidence is peculiarly within the sound discretion of the trial court and will not be reversed absent a showing of abuse of that discretion." (citation omitted)).

**{27}** In sum, Defendant argues that the State's polygraph evidence should not have been admitted in this case and should not be permitted in future criminal cases either. Emphasizing that polygraphs are unreliable, Defendant highlights that New Mexico is one of the only states that allows polygraphs to be admitted in court. Defendant cites to federal circuit court cases and other state court cases to support the notion that polygraph results are generally disfavored and rarely admissible. Given that the science underlying polygraph testing remains weak and that most other jurisdictions do not recognize polygraph evidence as reliable, Defendant asks this Court to modify Rule 11-707 and its ruling in *Lee* and ban polygraph results from being admitted against a criminal defendant.

**{28}** The polygraph issue in this case does not meet the high threshold to overturn New Mexico Supreme Court precedent. This Court only overturns precedent in limited circumstances when it is "a remnant of abandoned doctrine," when it is unworkable, or if "changing circumstances have deprived the precedent of its original justification." *State v. Montoya*, 2013-NMSC-020, ¶ 40, 306 P.3d 426 (internal quotation marks and citation omitted).

**{29}** While this Court has ultimate authority over questions of practice and procedure, we choose to be prudent in exercising that authority. *See State v. Gutierrez*, 2020-NMSC-___, ¶ 111, ___P.3d ___ (S-1-SC-36394, Nov. 5, 2020) (referring the rule at issue to the Rules of Evidence Committee explaining that a rule change "should be the subject of comprehensive study and robust public discussion"). Without further analysis and public comment and consideration of the issue, we refrain from prematurely revisiting the rule allowing the admissibility of polygraph evidence.

**{30}** The district court's admission of polygraph evidence in this case was squarely permissible under Rule 11-707. In admitting expert testimony regarding polygraph results, the district court here did not "appl[y] an incorrect standard, incorrect substantive law," nor was "its discretionary decision . . . premised on a misapprehension of the law." *Sena*, 2020-NMSC-011, ¶ 15. (internal quotation marks and citation omitted) On the contrary, by admitting polygraph evidence, the district court applied the correct standard and substantive law and appropriately exercised its discretion.

### D.    Double Jeopardy and Improper Firearm Enhancement

**{31}** Lastly, Defendant argues that his sentence violates double jeopardy and includes an improper firearm enhancement. Defendant states that his convictions for both murder and shooting at a motor vehicle constitute double jeopardy. Defendant explains that this is a double-description case under which he was convicted of two crimes for the same conduct of fatally shooting Mr. Severinghaus while Mr. Severinghaus was sitting in his car. Because the conduct underlying both crimes was unitary, Defendant asks this Court to vacate his conviction for shooting at a motor vehicle. The State agrees that Defendant's conduct for both crimes was unitary. Therefore, the State stipulates to Defendant's argument that his conviction for shooting at a motor vehicle should be vacated to avoid a violation of double jeopardy.

**{32}** Defendant also argues that the district court improperly applied a one-year firearm enhancement to his sentence for first-degree murder. Pursuant to NMSA 1978, Section 31-18-16(A) (1993), a court may impose such an enhancement if the defendant used a firearm "in the commission of a *noncapital* felony." (Emphasis added.) Here, Defendant used a firearm in the commission of a *capital* felony. NMSA 1978, Section 30-2-1(A) (1994) ("Whoever commits murder in the first degree is guilty of a capital felony."). It was therefore incorrect for the district court to attach a firearm enhancement to Defendant's sentence for a capital crime. Defendant asks this Court to vacate his one-year enhancement because it violates Section 31-18-16(A). The State stipulates to this request.

**{33}** Though the Court is not bound by the State's concessions, *State v. Montoya*, 2015-NMSC-010, ¶ 58, 345 P.3d 1056, both of Defendant's arguments bring to light clear errors in sentencing. To remedy these errors, we vacate Defendant's conviction for shooting at a motor vehicle along with his one-year firearm enhancement.

### III.    CONCLUSION

**{34}** As to Defendant's arguments regarding an abuse of discretion, we hold that the district court did not abuse its discretion in denying a mistrial nor in admitting polygraph evidence. Accordingly, we affirm Defendant's conviction for first-degree murder. We vacate Defendant's conviction for shooting at a motor vehicle along with his one-year firearm enhancement.

**{35}   IT IS SO ORDERED.**

**BARBARA J. VIGIL, Justice**

**WE CONCUR:**

**MICHAEL E. VIGIL, Chief Justice**

**C. SHANNON BACON, Justice**

**DAVID K. THOMSON, Justice**