This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**No. A-1-CA-40313**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**JOHN DENT a/k/a JOHN M. DENT,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Bruce Fox, District Court Judge**

Raúl Torrez, Attorney General
Benjamin L. Lammons, Assistant Attorney General
Santa Fe, NM
Meryl E. Francolini, Assistant Solicitor General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**DUFFY, Judge.**

**{1}** Following a jury trial, Defendant John Dent was convicted of six crimes: (1) kidnapping in the first degree, contrary to NMSA 1978, Section 30-4-1 (2003); (2) criminal sexual penetration (CSP) in the third degree, contrary to NMSA 1978, Section 30-9-11(F) (2009); (3) aggravated battery against a household member (strangulation), contrary to NMSA 1978, Section 30-3-16(C)(3) (2018); (4) aggravated battery against a

household member (great bodily harm), contrary to Section 30-3-16(C)(1); (5) bribery or intimidation of a witness (threats) (reporting), contrary to NMSA 1978, Section 30-24-3 (1997); and (6) interference with communications, contrary to NMSA 1978, Section 30-12-1 (1979). On appeal, Defendant raises four issues, arguing that (1) his convictions for kidnapping in the first degree and CSP violate double jeopardy; (2) insufficient evidence supported his convictions for CSP, aggravated battery (strangulation), and intimidation of a witness; (3) the State improperly shifted the burden of proof through a comment at closing; and (4) Defendant received ineffective assistance of counsel at trial. We vacate Defendant's conviction for CSP on double jeopardy grounds, but otherwise affirm.

## BACKGROUND

{2}     Over a two-day period, Defendant confined, beat, and sexually assaulted his ex-girlfriend, leaving her with bruises, a broken nose, broken ribs, and a collapsed lung. Unless otherwise noted, the background facts are taken from Victim's testimony at trial.

{3}     The incident began on the night of December 31, 2019. Victim and the couple's one-year-old daughter spent New Year's Eve at Defendant's apartment. Victim and Defendant were living apart at the time, but they were co-parenting and working on getting back together.

{4}     Late that evening, Defendant accused Victim of being sneaky with her cell phone. Victim gave Defendant permission to look through her phone but reminded him that the two were not a couple. When Defendant discovered flirtatious messages Victim had exchanged with another man, Defendant became angry, called Victim a "slut" and a "whore," and began hitting her in the face and head with a closed fist. Their daughter awoke and began to cry; both parents went to her but Defendant reached her first and picked her up. The child was crying for Victim, so Victim attempted to go around Defendant to get to her, but Defendant pushed Victim back.

{5}     Victim ran to the front door and tried to leave the apartment. She got the door open but Defendant grabbed the back of her head, pulled her back, and slammed her head against the door. Defendant locked the door, pulled Victim to the floor and started hitting her in the back. Defendant told Victim that she was never going to leave the apartment. He pulled Victim up and held her against a wall by her neck, choking her. Defendant then dragged Victim to the master bedroom closet, closed the door, and told her she was not allowed to leave until he let her out or she would "suffer the consequences." He left her there for about thirty minutes with a bloody nose until their daughter fell back asleep.

{6}     When Defendant returned, he started hitting Victim again in the face and the back of the head. She lost consciousness when he hit her on her temple. Victim woke up in the shower, covered in blood. She noticed that her cell phone was also in the shower, shattered. Defendant made Victim rinse off and then lie down at the foot of the bed, soaking wet and unclothed, without a towel or blanket. Defendant lay in front of the

bedroom door and told Victim that if she "'did something stupid' he would wake up and beat her." At some point during the night Victim began shivering and Defendant kicked her in the ribs. Victim was eventually able to get dressed and slept for roughly an hour before Defendant woke her up around 5:00 a.m.

{7}     Defendant told Victim to go into the living room. Victim complied. Defendant told her that "if she wanted to 'act like a slut' he would 'treat her like a slut,'" hit her on the side of the face, and pulled down her pants and had sex with her. Victim was scared but did not fight back because she feared that "he would just do something and hurt [her] even more." Afterward, she went and slept next to her daughter for a couple of hours. Upon waking, the child did not recognize Victim because her face was bruised and swollen. Defendant awoke from the next room and told Victim to ice her face.

{8}     Victim told Defendant that they needed more diapers. Before leaving to get diapers, Defendant instructed Victim to stay in the living room where he could see her on the home security camera located in a corner of the room, so that he could see if she tried to "leave and do something stupid." Defendant told Victim that if he did not see her on the camera, he would "beat [her] even more" when he returned.

{9}     Defendant was gone for about fifteen minutes. When he returned, Victim told him that she needed to get a new phone so she could get in contact with her mother, who would become suspicious if she did not hear from Victim for too long given their close relationship. Defendant sent Victim's mother a text message from his phone to let her know Victim's phone was not working, and agreed to take Victim to get a new phone. Defendant told Victim to cover her face with makeup and gave her a hat, scarf, and sunglasses to wear to hide the bruising. They went to an AT&T store and while there, Defendant asked a sales representative about a tracker to put on Victim's car. When the sales representative tried to set up Victim's phone, Defendant said he would do it himself. Defendant set up the phone when they returned to his apartment and told Victim he had put a tracker on her phone that would allow him to see where she was going, who she was calling, and every picture and text message she sent. Defendant also demanded Victim's passwords to access old messages and photos.

{10}    That night, Defendant confronted Victim about messages and comments he discovered on Victim's phone and became angry again. He punched Victim's legs multiple times and called her a "fucking whore." He made Victim take off her clothes and lie down in a dog bed. He kicked Victim, grabbed her, and punched her for twenty minutes. He told Victim to get on all fours "like the dog she was" and then rapidly inserted an anal plug into her anus about fifteen times while holding the back of her neck. Victim told Defendant to stop multiple times but he refused. After that, Defendant told Victim to choose her next punishment, either that he fill up the bathtub with water and hold her head under water or that she sleep outside naked. Victim chose the bathtub and feared she would not survive the night. With the bathtub full, Defendant held Victim's face about an inch above the water for several minutes and told her if she kept acting the way she was that he would kill her. Defendant said to Victim that if she tried to leave or told anyone, he would use his "cop friends" to take their daughter away

from Victim forever. He also threatened to bash Victim's head in with a bat if he found anything else on her phone. That night, as she was preparing to go to sleep, Victim told Defendant she was having trouble breathing and was experiencing sharp pains in her chest. Defendant told Victim she was overreacting.

{11}   The next morning, Victim told Defendant that she had to go to her mother's house to pick up more clothes for herself and their daughter. Defendant told Victim that if she tried to leave and not come back, that he was going to find her and kill her. Defendant started punching Victim's legs again and told her that she was never going to leave him, that she would always be his. Before Defendant left for work, he asked Victim if her mother would be there and told her to wear makeup and a hat so her mother would not see her injuries. Defendant reminded Victim that he had a tracker on her phone and that if she did "something stupid that [she] better be prepared for the punishment that he's gonna give [her] when he gets back." Defendant left for work around 10:00 a.m., after which Victim loaded up her car and left with her daughter.

{12}   Defendant called Victim multiple times while she was driving to her mother's house. He told her to turn around and go back to his apartment to get more punishments. Victim called her mother and sister and told them to stay at her mom's house. Victim's mother asked if Defendant had hit her; Victim said "yes," and told her mother not to freak out when she saw her. Victim stayed on the phone with her mother during the seven-minute drive to her mother's house. Defendant kept calling Victim. When Victim arrived at her mother's house, her mother and stepfather were waiting outside for her. Victim got out of her car and her mother put Victim and the child in the backseat of mother's car as Defendant drove up. Defendant approached and said, "Are you really gonna do this? Are you really gonna put me in jail?" Victim's mother got in the driver's seat, locked the door, and called the police. Defendant walked to the car where Victim was and tried to open the car door. Victim's mother shouted at him to get out and he left before police arrived.

{13}   Officers arrived within minutes. They interviewed Victim and photographed her injuries. These photos were admitted as exhibits at trial and showed significant bruising all over Victim's head and body. Paramedics took Victim by ambulance to the hospital, where she underwent surgery for a collapsed lung, punctured by a broken rib. She remained in the hospital for three days.

{14}   Dr. Angela Sanchez, who treated Victim, testified that Victim had petechiae and significant bruising on her neck. Dr. Sanchez testified that one possible cause of the petechiae is strangulation because the loss of oxygen required for them to form could be caused by, among other things, "hands around the neck." Dr. Sanchez also testified that petechiae are caused by an "obstruction of blood from the arterial side to the venous side."

{15}   Defendant testified at trial and denied Victim's account. He claimed that he injured Victim in defense of their child. He also denied that he had nonconsensual sex with Victim.

**{16}** The jury found Defendant guilty on all counts. The district court imposed a total sentence of thirty years and 364 days, with six years and 364 days suspended. Defendant appeals.

**DISCUSSION**

## I. Defendant's Convictions for First-Degree Kidnapping and CSP Violate Double Jeopardy

**{17}** Defendant first raises a double jeopardy challenge regarding his convictions for first-degree kidnapping and CSP. We review Defendant's double jeopardy claim de novo. *See State v. Swick*, 2012-NMSC-018, ¶ 10, 279 P.3d 747.

**{18}** This is a "double description case[] in which a single act results in multiple charges under different criminal statutes." *State v. Gallegos*, 2011-NMSC-027, ¶ 31, 254 P.3d 655 (alteration, internal quotation marks, and citation omitted). To evaluate a double description challenge, we apply the two-part test set forth in *Swafford v. State*, 1991-NMSC-043, ¶ 25, 112 N.M. 3, 810 P.2d 1223, which asks: (1) "whether the conduct underlying the offenses is unitary, i.e., whether the same conduct violates both statutes"; and (2) if so, "whether the [L]egislature intended to create separately punishable offenses." *See State v. Begaye*, 2023-NMSC-015, ¶ 13, 533 P.3d 1057. "Only if the first part of the test is answered in the affirmative, and the second in the negative, will the double jeopardy clause prohibit multiple punishment in the same trial." *Id.* (internal quotation marks and citation omitted).

**{19}** Defendant contends that his conviction for CSP elevated the kidnapping charge from a second-degree to a first-degree offense, resulting in a double jeopardy violation because the two convictions were based on unitary conduct and the CSP conviction was subsumed in his kidnapping conviction. Applying recent precedent from this Court, we agree. *See State v. Serrato*, 2021-NMCA-027, ¶ 27, 493 P.3d 383.

### A. Unitary Conduct

**{20}** "The proper analytical framework for determining unitary conduct is whether the facts presented at trial establish that the jury reasonably could have inferred independent factual bases for the charged offenses." *Id.* ¶ 22 (internal quotation marks and citation omitted). We begin our review with the elements of the charged offenses and the instructions given to the jury because they are dispositive of the issue presented here. *See State v. Sena*, 2020-NMSC-011, ¶ 46, 470 P.3d 227 (stating that "in determining whether there are . . . sufficient indicia of distinctness, we have also looked to the elements of the charged offenses, the facts presented at trial, and the instructions given to the jury").

**{21}** The jury instruction for first-degree kidnapping presented the jury with three alternatives that would elevate the offense to a first-degree felony—that (1) "Defendant did not voluntarily free [Victim] in a safe place"; (2) "Defendant inflicted physical injury

upon [Victim] during the course of the kidnapping"; or (3) "Defendant inflicted a sexual offense upon [Victim] during the course of the kidnapping." *See* UJI 14-403 NMRA. The jury returned a general verdict and therefore, there is nothing in the record to establish which alternative the jury relied upon in reaching its guilty verdict. *See State v. Salazar*, 1997-NMSC-044, ¶¶ 32-42, 123 N.M. 778, 945 P.2d 996 (holding that jury unanimity is not required when alternative theories are presented to the jury). Because of this, we apply the *Foster* presumption, which directs that "we must presume that a conviction under a general verdict requires reversal if the jury is instructed on an alternative basis for the conviction that would result in double jeopardy, and the record does not disclose whether the jury relied on this legally inadequate alternative." *State v. Foster*, 1999-NMSC-007, ¶ 28, 126 N.M. 646, 974 P.2d 140, *abrogated on other grounds by Kersey v. Hatch*, 2010-NMSC-020, ¶ 17, 148 N.M. 381, 237 P.3d 683. As applied here, we must presume the jury relied upon the sexual offense alternative in convicting Defendant of kidnapping. *See Sena*, 2020-NMSC-011, ¶ 54.

**{22}** At this step of our analysis, we briefly address—and reject—the State's argument that the jury could have relied on either of the other two alternatives as a basis for the kidnapping conviction. The State argues primarily that Defendant injured Victim before he inflicted any sexual offense, and therefore, the first-degree kidnapping (physical injury) was complete before Defendant committed CSP. This is a misapplication of the *Foster* presumption. *Foster* requires us to presume that Defendant's kidnapping conviction was based upon the sexual offense alternative when evaluating the convictions at issue in this appeal—meaning that we must disregard the physical injury alternative as a basis for the conviction. *See Sena*, 2020-NMSC-011, ¶ 54; *see also Serrato*, 2021-NMCA-027, ¶ 26 (holding that when the State relies on evidence of a sexual offense to elevate the base crime of kidnapping to a higher first-degree felony offense, "the elements of first-degree kidnapping were not satisfied until a sexual offense was committed").

**{23}** With these concepts in mind, the remainder of our analysis turns on the fact that the jury was instructed on only one sexual offense. The kidnapping instruction required the State to prove that Defendant inflicted a "sexual offense" upon Victim, without identifying the specific offense. Even though Victim testified to sexual offenses other than the act alleged as the basis for Defendant's CSP conviction, the jury was never instructed on the elements of any sexual offense other than the CSP alleged in Count 2. This is dispositive of the issue presented.

**{24}** In *State v. Sotelo*, 2013-NMCA-028, ¶ 25, 296 P.3d 1232, this Court noted that if a sexual offense is alleged to support first-degree kidnapping, "the jury must find that the elements of that crime are satisfied." Applying *Sotelo*, this Court recently reaffirmed that "if a 'sexual offense' is alleged to increase kidnapping to a first-degree felony, the jury must find that the elements of that crime are satisfied." *State v. Autrey*, A-1-CA-38116, mem. op. ¶ 14 (N.M. Ct. App. Apr. 12, 2022) (nonprecedential) (internal quotation marks and citation omitted), *cert. quashed* (S-1-SC-39383, Feb. 21, 2024); *see also State v. Dominguez*, 2014-NMCA-064, ¶ 19, 327 P.3d 1092 (providing that the jury's return of a verdict on CSP established the "sexual offense" element of first-degree

kidnapping); *State v. Gallegos*, 2009-NMSC-017, ¶ 16, 146 N.M. 88, 206 P.3d 993 (providing that "[i]f the [s]tate wishes to convict an accused of first-degree kidnapping, it must also establish the elements in Subsection (B) [of Section 30-4-1], contained in the special verdict form [UJI 14-6018 NMRA (withdrawn)]" (emphasis omitted)).

**{25}** The jury in this case received only one instruction setting out the elements of a sexual offense—the instruction for CSP charged in Count 2, which stated that the jury could find Defendant committed CSP if he "caused the insertion, to any extent, of a butt plug or object, into the anus of [Victim]." This instruction limited the evidence the jury could consider to find Defendant guilty of CSP. Because no other instruction was given that directed the jury to any other act for purposes of establishing a separate sexual offense for the kidnapping charge, the "jury properly could have found that Defendant committed only one sexual offense"—the anal penetration resulting in Defendant's CSP conviction. *See Autrey*, A-1-CA-38116, mem. op. ¶ 15 ("[W]hile the jury *in theory* could have relied on sexual offenses other than the vaginal penetration to convict [the d]efendant of first-degree kidnapping had it been instructed on those offenses, the jury did not in fact do so, because it was never so instructed."). Therefore, "[a]s the facts presented at trial demonstrate that the first-degree kidnapping and [CSP] charges were based on the *same* conduct, we are bound to conclude that the conduct underlying both offenses is unitary." *Serrato*, 2021-NMCA-027, ¶ 27.

## B.    Legislative Intent

**{26}** We next consider whether the Legislature intended multiple punishments for the same offense. *See Begaye*, 2023-NMSC-015, ¶ 13. Since the statute for first-degree kidnapping contains multiple alternatives that could elevate the charge from a second-degree to a first-degree felony, we employ the modified *Blockburger* test, considering "not only whether each statute *in the abstract* requires proof of a fact that the other does not, but also whether the statute, *as applied by the State in a given case*, overlaps with other criminal statutes so that the accused is being punished twice for the same offense." *Id.* ¶ 22 (alteration, internal quotation marks, and citation omitted)).

**{27}** Neither the grand jury indictment nor the State's closing argument resolve the matter, and we turn again to the jury instructions in this case. As discussed, the jury was instructed only on one sexual offense—CSP as set out in Count 2. For first-degree kidnapping, the jury was instructed that it must find that Defendant inflicted a sexual offense upon Victim during the course of the kidnapping. Because the jury was not instructed on any sexual offense other than the CSP in Count 2, we must conclude that Defendant was found to have committed only this one sexual offense. Applying modified *Blockburger*, Defendant's CSP conviction was subsumed within his first-degree kidnapping conviction. Therefore, Defendant's convictions for CSP and first-degree kidnapping violate his right to be free from double jeopardy, and the lesser conviction of CSP must be vacated. *See State v. Santillanes*, 2001-NMSC-018, ¶ 28, 130 N.M. 464, 27 P.3d 456.

**{28}** As this Court recently emphasized in *State v. Neal*, A-1-CA-40205, mem. op. ¶ 17 (N.M. Ct. App. Apr. 24, 2024) (nonprecedential), *cert. granted* (S-1-SC-40407 Sept. 6, 2024), this outcome is required given the State's election to pursue the kidnapping charge on alternative theories. It may well be that the same facts could have resulted in a different constellation of charges or arguments that may have supported separate crimes. *See State v. Lorenzo*, 2024-NMSC-003, ¶ 11, 545 P.3d 1156 (noting that "had the State opted for a different presentation at trial, it is possible that the jury could have decided that different uses of force satisfied the elements of each crime"). On the record before us, however, settled law requires us to conclude that the State's legal theory, as presented to the jury, violates double jeopardy.

## II.      Sufficiency of the Evidence

**{29}** Defendant challenges the sufficiency of the evidence supporting his convictions for CSP, aggravated battery (strangulation), and intimidation of a witness. We apply the well-known sufficiency of the evidence standard of review set forth in *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176.

## A.      CSP

**{30}** Even though we remand to the district court to vacate Defendant's conviction for CSP, we nonetheless consider Defendant's argument that insufficient evidence supported the conviction because it was the sexual offense used to elevate the kidnapping charge from second- to first-degree.

**{31}** To convict Defendant of CSP, the jury had to find, in relevant part, that "[D]efendant caused the insertion, to any extent, of a butt plug or object, into the anus of [Victim]." Victim testified that Defendant rapidly inserted an anal plug into her anus about fifteen times, despite her repeatedly telling him to stop. While Defendant denied that this occurred, "[c]ontrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject Defendant's version of the facts." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829. Likewise, although Defendant contends that Victim's testimony was in and of itself insufficient because there was no forensic evidence to corroborate Victim's account, Victim did not initially disclose the CSP to law enforcement and did not undergo a SANE exam, and previously engaged in consensual sexual intercourse with Defendant earlier on December 31, 2019, we note that "[a]s a general rule, the testimony of a single witness is sufficient evidence for a conviction." *State v. Soliz*, 1969-NMCA-043, ¶ 8, 80 N.M. 297, 454 P.2d 779. To the extent Defendant challenges the credibility of Victim's account, "we defer to the fact-finder when it weighs the credibility of witnesses and resolves conflicts in witness testimony." *State v. Simmons*, 2018-NMCA-015, ¶ 13, 409 P.3d 1030 (internal quotation marks and citation omitted).

**{32}** Based on Victim's testimony at trial, the jury was presented with sufficient evidence to find that Defendant committed CSP as alleged in Count 2.

**B.      Aggravated Battery Against a Household Member (Strangulation or Suffocation)**

{33}      Defendant argues that the State failed to present sufficient evidence to establish the second element necessary for the jury to convict him of aggravated battery against a household member—that "[b]y strangling [Victim], [D]efendant impeded the normal breathing or blood circulation of [Victim]." Defendant argues that his conviction was not supported by sufficient evidence because Victim "specifically testified multiple times that when [Defendant] put his hands around her neck it did not interfere with her breathing."

{34}      Although Victim did testify that she was still able to breathe while Defendant attempted to choke her, to find Defendant guilty of strangulation, the jury had to find that Defendant either "impeded her normal breathing *or blood circulation.*" Defendant does not address the second alternative and makes no argument that the evidence was insufficient to establish that Victim's circulation was impeded. At trial, the State presented testimony from Dr. Sanchez, who testified that Victim had petechiae on her neck, which was consistent with Victim's blood circulation being impeded. Dr. Sanchez testified that petechiae are caused by an "obstruction of blood from the arterial side to the venous side." Combined with Victim's testimony that Defendant placed his hands on her neck and tried to choke her, this was sufficient evidence for a rational jury to infer that Defendant impeded the blood circulation of Victim.

**C.      Intimidation of a Witness**

{35}      Defendant also challenges the sufficiency of the evidence supporting his conviction for intimidation of a witness. To convict Defendant of intimidation of a witness, the jury had to find that "Defendant knowingly intimidated or threatened [Victim] with the intent to keep [Victim] from truthfully reporting to a law enforcement officer or any agency that is responsible for enforcing criminal laws information relating to the commission or possible commission of kidnapping, criminal sexual penetration, aggravated battery, and inference with communications." In support of this charge, the State at trial pointed to Victim's testimony that if she tried to leave, Defendant would beat her more and that Defendant stated he had friends who were police officers who would take her child away if she told someone. Notwithstanding this evidence, Defendant argues that this testimony was merely proof of kidnapping, aimed at keeping Victim from leaving. Defendant also emphasizes that at trial, Victim denied that he expressly threatened her about reporting the incident.

{36}      Although Victim responded, "No" when asked if Defendant threatened her, in context this refers to the absence of an explicit threat. Even without an explicit threat, Victim offered ample testimony that would allow a reasonable jury to conclude that Defendant threatened her. *See In re Gabriel M.*, 2002-NMCA-047, ¶¶ 22-33, 132 N.M. 124, 45 P.3d 64 (holding that circumstantial evidence of intent was enough under a sufficiency of the evidence analysis to establish intimidation of a witness); *Rojo*, 1999-NMSC-001, ¶ 23 ("Just because the evidence supporting the conviction was circumstantial does not mean it was not substantial evidence." (internal quotation marks

and citation omitted)). For example, Defendant's statement that he would use his police officer friends to take her child away is an implicit threat that Victim should not report to the police. Likewise, during the kidnapping, Defendant left to go to the store but required Victim to remain in front of a camera so that he could see if she tried to "leave and do something stupid." Victim also accompanied Defendant to a phone store, where she did not report her abuse to the sales representative because Defendant was watching her. *See In re Gabriel M.*, 2002-NMCA-047, ¶ 25 (upholding a defendant's conviction for intimidation of witnesses based on the circumstantial evidence that included witnesses not telling a "fire marshal everything the first time they were interviewed" because the defendant was in the room and watching them). Defendant also told Victim he would be tracking her phone and that if she "tried to do something stupid" he would harm her. *See State v. Fernandez*, 1994-NMCA-056, ¶ 35, 117 N.M. 673, 875 P.2d 1104 (holding that the intimidation statute "does not include 'actual intimidation' by a victim as an element of the offense. The State was not, then, required to prove that [victim] was intimidated; it was sufficient that the prosecution established that [the d]efendant threatened [victim]"). Once Victim escaped to her mother's house, Defendant followed her there and pressured her not to call the police.

**{37}**     Indulging all reasonable inferences in support of the verdict, Victim's testimony provided substantial evidence from which a rational jury could have found that these actions were intended to intimidate Victim with the goal of preventing her from reporting to the police. *See Rojo*, 1999-NMSC-001, ¶ 19. We therefore affirm.

### III.     The State's Comment at Closing Did Not Shift the Burden To Defendant

**{38}**     Defendant claims that during closing arguments, the State improperly shifted the burden to prove that he acted in defense of another. Defendant's argument focuses on a single comment by the prosecutor, who remarked during rebuttal that "[i]f the defendant doesn't meet a single element of this defense, one single element, then you should not find that he acted in defense of another." Defendant did not object, and our review is therefore for fundamental error.

**{39}**     Our analysis centers on whether the prosecutor's comment "materially altered the trial or likely confused the jury . . . , and thereby deprived the accused of a fair trial." *State v. Sosa*, 2009-NMSC-056, ¶ 34, 147 N.M. 351, 223 P.3d 348; *see also State v. Fry*, 2006-NMSC-001, ¶ 50, 138 N.M. 700, 126 P.3d 516 (stating that to determine whether the prosecutor's argument served to deprive the defendant of a fair trial "we review the comment in context with the closing argument as a whole and in the context of the remaining trial proceedings so that we may gain a full understanding of the comments and their potential effect on the jury" (internal quotation marks and citation omitted)).

**{40}**     When considered in context, the prosecutor's comment during rebuttal was merely argument that the evidence did not support Defendant's claim that he acted in defense of his daughter. Defendant's defense was grounded in his contention that he was protecting his daughter from immediate danger of bodily harm because as he held

his daughter, Victim tried to hit him and grab her. In closing, the prosecutor argued that Victim's injuries could not have been caused by Defendant protecting their child. The prosecutor pointed to Victim's injuries, emphasizing that she had been injured over the course of several days and highlighting the severity of those injuries, and argued that Defendant's own testimony established that the force he used was not reasonable. The prosecutor pointed out that Defendant repeatedly left Victim alone with their child, despite claiming he was justified in using physical force to protect the child from her. Because the statement Defendant points to was part of an argument that the evidence did not fit the required elements of the defense, we cannot conclude that the prosecutor's brief comment materially altered the trial or likely confused the jury regarding the burden of proof.[1] Moreover, the district court instructed the jury that it was the State's burden to prove that Defendant did not act in defense of his daughter, and to prove Defendant's guilt beyond a reasonable doubt. "We presume that the jury followed the written instructions and did not rely for its verdict on one very brief part of the State's closing remarks." *State v. Armendarez*, 1992-NMSC-012, ¶ 13, 113 N.M. 335, 825 P.2d 1245. For these reasons, we agree with the State that the prosecutor's statement did not rise to the level of fundamental error.

## VI. Defendant Has Not Established a Prima Facie Case of Ineffective Assistance of Counsel

**{41}** Defendant asserts that he received ineffective assistance of counsel below because his trial counsel failed to properly impeach witnesses, paused for extended periods when making a statement or asking a question, failed to adequately address jury complaints that they could not hear him, failed to move to strike testimony from a detective with memory deficiencies, and failed to object when the State repeatedly referred to Victim as "victim" in violation of a previous court order. Defendant does not direct us to where in the trial these alleged deficiencies occurred, and appears to acknowledge that his claim is based, at least in part, on evidence not presently in the record on appeal.

**{42}** The record before us "does not provide enough information to adequately determine whether an action was error or caused prejudice," and is inadequate to establish a prima facie case of ineffective assistance of counsel. *State v. Bernal*, 2006-NMSC-050, ¶ 33, 140 N.M. 644, 146 P.3d 289. When further evidence is required, our Supreme Court has expressed "a general preference that such claims be brought and resolved through habeas corpus proceedings." *Id.* Our conclusion that Defendant has not presented a prima facie case of ineffective assistance of counsel on direct appeal

---

[1]Defendant also asserts that the district court erred because defense of another was not included in the elements instructions for the relevant crimes. However, our Supreme Court has held that a "separate, properly submitted self-defense instruction cured any error." *State v. Marquez*, 2016-NMSC-025, ¶ 49, 376 P.3d 815. Defendant appears to concede that *Marquez* is on point, and thus, the separate instruction on defense of another given in this case cured any error resulting from the omission of the defense as an element of the charged crime(s).

does not preclude Defendant from pursuing habeas corpus proceedings on this issue. *See id.* ¶ 36.

**CONCLUSION**

**{43}** Having concluded that Defendant's right to be free from double jeopardy was violated, we remand to the district court to vacate Defendant's CSP conviction and to resentence him accordingly. We otherwise affirm.

**{44}   IT IS SO ORDERED.**

**MEGAN P. DUFFY, Judge**

**WE CONCUR:**

**KRISTINA BOGARDUS, Judge**

**JACQUELINE R. MEDINA, Judge**