This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports.  Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions.  Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-40787**

**STATE OF NEW MEXICO,**

  Plaintiff-Appellee,

v.

**MACARIO ARROYOS,**

  Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF GRANT COUNTY**
**Thomas F. Stewart, District Court Judge**

Raúl Torrez, Attorney General
Santa Fe, NM
Walter Hart, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Joelle N. Gonzales, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## MEMORANDUM OPINION

**YOHALEM, Judge.**

**{1}** Defendant Macario Arroyos was charged with first-degree murder, *see* NMSA 1978, § 30-2-1(A) (1994), and two counts of battery upon a peace officer, *see* NMSA 1978, § 30-22-24 (1971). The jury acquitted Defendant of first-degree murder, but found him guilty of the lesser included offense of second-degree murder, *see* § 30-2-1(B), as well as of both counts of battery on a peace officer. Defendant argues that (1) the district court's failure to sever the first-degree murder charge from the two battery upon

a peace officer charges and try them separately constituted fundamental error and requires reversal; (2) the district court erred in admitting the videotaped police interview of a witness who testified at trial; and (3) the State engaged in prosecutorial misconduct when it elicited testimony from a law enforcement officer that he knew Defendant because he had "prior dealings" with him. Unpersuaded, we affirm.

**BACKGROUND**

**1.      The Evidence Supporting Defendant's Conviction of Murder**

{2}      Darlinda Little was the sole eyewitness to the murder. Her testimony was at the center of the prosecution's case. She testified to the following events.

{3}      Approximately one week before the murder, Little hired Victim as a live-in caretaker. Late in the evening on February 8, 2020, Little was watching television in her living room. Defendant arrived unannounced and entered her residence without knocking. He walked straight to Victim's bedroom. Little estimated the time as 8:30 or 9:00 or 9:30 p.m.

{4}      Little testified that she had first met Defendant through his mother, one of her friends, about four or five months before the incident. Defendant had arrived unannounced other times before this night, and Little testified that she followed her usual practice of calling Defendant's mother to ask her to "come and get him" because she didn't want him there. Little admitted that she didn't like Defendant very much.

{5}      After about five minutes, Victim came out of the bedroom, followed a few minutes later by Defendant. They joined Little in the living room. The three engaged for a few minutes in conversation about a movie that was on television. Little noticed that Defendant, who was sitting in a recliner opposite Victim, who was sitting on a couch, "just kept staring at [Victim]."

{6}      At some point, Defendant "jumped" across the room and onto the couch next to Victim and said "I'm gonna kill you, you bitch," as he began striking her in the face. Defendant grabbed Victim by the throat and dragged her to the floor. He put his left leg across her neck, while he began stabbing her or at least making stabbing motions with two knives he held in his right hand. Little testified Defendant held a third knife in his left hand.

{7}      Little tried to intervene, hitting Defendant with various objects in an unsuccessful attempt to "make him quit." Little looked for her cell phone, which she testified had been knocked off a table when Defendant first lunged at Victim, and screamed for help, hoping her neighbors would respond. "After everything was over with," Defendant approached Little, slashed at her forearms with his knives, and "took off out the door."

{8}      Little tried to resuscitate Victim, without success. She found her cell phone and called police. She identified Defendant to police, calling him by the name "Sharky." She

testified she knew his real first name and recognized it when police asked her if it was Macario, but could not pronounce it.

**{9}** The prosecution also called as a witness the medical examiner who had performed the autopsy on Victim. The examiner testified that Victim had been strangled so forcefully that her trachea was crushed, causing her death.

## 2. The Evidence Supporting Defendant's Conviction of Two Counts of Battery of a Peace Officer

**{10}** Officer Chavez located Defendant at a nearby hospital in the early morning hours of February 9, 2020. Officer Chavez testified that he recognized Defendant from "previous knowledge," stating that he had "dealt with him before." Police arrested Defendant and detained him at the hospital while they obtained a warrant for his DNA. Two detectives executed the warrant, with the assistance of two additional officers. A fifth officer, Officer Flores, filmed the other officers' attempt to execute the warrant with his body camera, and testified at trial about his observations of Defendant's behavior, laying the foundation for the introduction of the video camera footage into evidence.

**{11}** Officer Flores testified that Defendant became "very aggressive [and] abusive towards officers . . . when he was advised of the search warrant on his person." Officer Flores described three officers struggling to subdue Defendant and to pry open Defendant's hands to get the fingernail swabs authorized by the warrant. According to Officer Flores, Defendant was attacking and trying to harm the officers who were taking the samples from him. The State emphasized in closing that seven hours had passed since they learned of the murder. The prosecution claimed the evidence showed Defendant had changed his clothes and washed his hands since the time of the murder. The State noted that Defendant was in the bathroom at the hospital when officers arrested him, and that Defendant went to the sink in the hospital room during the video. The State asked the jury to infer that Defendant had residue from the crime on his clothes and hands, including Victim's DNA, that he wanted to hide.

**{12}** The videotape, introduced through Officer Flores's testimony, was played for the jury without objection. It showed Defendant shouting curses and threats at the officers, lunging at the two detectives attempting to collect DNA samples, and violently resisting any attempt to swab his mouth and fingernails. Defendant was seen on the videotape kicking one officer in the leg and another in an arm. This attack was the basis relied on by the State to charge the two counts of battery on a peace officer that were tried together with Defendant's murder charge.

## DISCUSSION

## I. There Was No Fundamental Error in Trying All Counts Together

**{13}** Defendant argues that he was severely prejudiced by the district court's failure to sever his murder charge and try it separately from the two counts of battery on a peace

officer. Acknowledging that he did not move for severance in the district court and did not otherwise preserve this issue for appeal, Defendant argues it was fundamental error for the district court to fail to *sua sponte* sever the charges. He claims that allowing the jury that would decide whether he was guilty of murder to hear the testimony and watch the video camera recording of his behavior toward peace officers while they were attempting to obtain a DNA sample undermined his defense and led directly to his conviction of second-degree murder, making the conviction fundamentally unfair and requiring reversal. We are not persuaded.

## A.     Standard of Review for Fundamental Error

**{14}**    "Under the doctrine of fundamental error, an appellate court has the discretion to review an error that was not preserved in the trial court to determine if a defendant's conviction shocks the conscience because either (1) the defendant is indisputably innocent, or (2) a mistake in the process makes a conviction fundamentally unfair notwithstanding the apparent guilt of the accused." *State v. Astorga*, 2015-NMSC-007, ¶ 14, 343 P.3d 1245 (alternation, internal quotation marks and citations omitted). We also will reverse a conviction for fundamental error "when a fundamental unfairness within the system has undermined judicial integrity." *State v. Silva*, 2008-NMSC-051, ¶ 13, 144 N.M. 815, 192 P.3d 1192 (internal quotation marks and citation omitted).

**{15}**    Applying the fundamental error standard to the claim of error made by Defendant, we look first at whether we would have found error in refusing to sever the charges for trial had a motion for severance been filed, and then, if we find error, we proceed to determine if that error undermined Defendant's fundamental rights or deprived him of a right essential to his defense or to judicial integrity.

## B.     Under the Relevant Principles of Law, Severance Was Not Required

**{16}**    The general rule in New Mexico is that all offenses committed by a defendant that are based on the same conduct or on a series of connected acts or part of a single scheme or plan or, even if not connected, of similar character, must be tried jointly. *See* Rule 5-203(A) NMRA. This rule protects a defendant's right to have criminal charges against them speedily resolved and it prevents the state from engaging in an extended series of prosecutions. *See State v. Gonzales*, 2013-NMSC-016, ¶ 26, 301 P.3d 380 ("The purpose of a compulsory joinder statute, viewed as a whole, is twofold: (1) to protect a defendant from the governmental harassment of being subjected to successive trials for offenses stemming from the same criminal episode; and (2) to ensure finality without unduly burdening the judicial process by repetitious litigation." (alteration, internal quotation marks, and citation omitted)). Severance, however, is permitted by Rule 5-203(C) where a joint trial would create a risk of actual prejudice to an individual defendant.

**{17}**    As relevant to Defendant's appeal, "[a] defendant might be prejudiced if the joinder of offenses permit[s] the jury to hear testimony that would have been otherwise inadmissible in separate trials." *State v. Jacobs*, 2000-NMSC-026, ¶ 15, 129 N.M. 448,

10 P.3d 127, *overruled on other grounds by State v. Martinez*, 2021-NMSC-002, ¶ 72, 478 P.3d 880. If the evidence concerning the other offenses would be admissible in both trials if the offenses are separately tried, the defendant is not prejudiced by a single trial that joins the offenses. *See id.* ("Cross-admissibility of evidence dispels any inference of prejudice.").

**{18}** Defendant contends that had he been separately tried for murder, the evidence of his aggressive and violent reaction to the police officers executing the warrant for a DNA sample would have been inadmissible under Rule 11-404(B) NMRA and Rule 11-403 NMRA, because the only relevance of that evidence to the murder charge was to show that Defendant was a violent, explosive person who had a propensity for violence and likely murdered Victim.

**{19}** Rule 11-404(B)(1) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." In other words, evidence of other crimes, wrongs, or conduct is not admissible to prove a person's propensity to act in a certain manner. If the sole relevance of the evidence of Defendant's conduct toward the officers attempting to collect DNA samples was, as Defendant argues, to convince the jury that he has a propensity to act belligerently and violently, and he thus was likely to have murdered Victim in a similar manner, the evidence would be inadmissible under Rule 11-404(B) at Defendant's murder trial. To avoid exposing the jury to this inadmissible and highly prejudicial propensity evidence, severance would have been required had Defendant asked the district court to sever the offenses for trial.

**{20}** Rule 11-404(B)(2), however, allows the admission of evidence of other crimes, wrongs, and other acts if it is relevant "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." "This list is not exhaustive and evidence of other wrongs may be admissible on alternative relevant bases so long as it is not admitted [solely] to prove conformity with character." *State v. Otto*, 2007-NMSC-012, ¶ 10, 141 N.M. 443, 157 P.3d 8 (internal quotation marks and citation omitted).

**{21}** Importantly, "Rule 11-404(B) is a rule of inclusion, not exclusion, providing for the admission of all evidence of other acts that are relevant to an issue in trial, other than the general propensity to commit the crime charged." *State v. Bailey*, 2017-NMSC-001, ¶ 14, 386 P.3d 1007 (alteration, internal quotation marks, and citation omitted). In other words, even if evidence shows that a defendant has a propensity to act in a certain way, so long as the evidence is also admissible for another purpose, it will be admitted.

**{22}** The State does not dispute that Officer Flores's testimony and the video footage of Defendant violently attempting to avoid the officers' efforts to obtain a DNA sample, and kicking both officers in the process, is propensity evidence. This evidence would be inadmissible at his murder trial if showing his propensity to violence was the sole purpose of that evidence. The State contends, however, that the evidence was also relevant to show that Defendant had a consciousness of guilt for the murder he had

committed just hours earlier. The State argues that evidence of Defendant aggressively resisting the collection of DNA evidence, which he knew the police intended to match with DNA evidence that might be found at the murder scene, was relevant to establish that Defendant knew he was guilty of murder.

**{23}** Although not expressly listed in Rule 11-404(B)(2), it has long been recognized that "consciousness of guilt . . . has independent relevance" and therefore "constitutes a permissible use of other acts or wrongs under Rule 11-404(B)." *State v. Martinez*, 1999-NMSC-018, ¶ 29, 127 N.M. 207, 979 P.2d 718 (internal quotation marks and citation omitted). In *State v. Ruiz*, for example, we allowed bribery charges to be tried with child abuse charges against the defendant. 1995-NMCA-007, ¶¶ 8-9, 119 N.M. 515, 892 P.2d 962. We held that evidence of the defendant's "threats and physical intimidation" of witnesses would have been admissible even if child abuse was tried separately because the evidence was not admitted as propensity evidence, but to urge the jury to find Defendant guilty because he was doing things that showed a consciousness of guilt. *Id.*, ¶ 14.

**{24}** Defendant responds that his aggression was directed at a single police officer, and not intended to avoid DNA testing. Defendant's argument that he had a different intent does not make the evidence inadmissible; the State is permitted to argue and the jury could infer from the evidence that Defendant was avoiding the taking of DNA evidence because he knew it was likely to connect him to the murder.

**{25}** Because we conclude that it would not have been an abuse of the district court's discretion to find the evidence of Defendant's resistance to the execution of the warrant cross-admissible at Defendant's murder trial under Rule 11-404(B) and not more prejudicial than probative under Rule 11-403, we find no error in the failure to sever the charges for trial. We therefore need not consider whether fundamental error requires reversal.

## II.     The District Court Did Not Abuse Its Discretion in Admitting the Videotape of Little's Prior Consistent Interview

**{26}** Defendant challenges the admission of a portion of the videotaped interview of Little by a law enforcement officer conducted a few days after the murder. The State sought to admit selections from the interview as a prior consistent statement offered to rehabilitate Little after Defendant's cross-examination about alleged inconsistencies between Little's prior statement at preliminary hearing, also close to the time of the murder, and her trial testimony.

**{27}** The State's argument to the district court for the admission of the law enforcement interview was focused solely on supporting Little's denial on cross-examination that she had ever made the inconsistent statements the defense alleged she had made close to the time of the murder. The State argued that it would use the taped interview to show that Little's trial testimony was "clear and consistent" with her prior statements, and that her story had not changed.

**{28}** Although neither the defense, in objecting to the admission of the prior consistent statement, nor the prosecution, in arguing for its admission, relied on Rule 11-801(D)(1)(b) NMRA, the district court admitted approximately 20 minutes of the interview, citing Rule 11-801(D)(1)(b). The district court stated that "the consistent testimony is admissible to rebut [the defense's] implication that she's either lying, or acting from improper influence or motive."

**{29}** On appeal, Defendant challenges the district court's admission of Little's prior consistent statement, arguing that the district court erred in concluding that the defense's cross-examination raised an inference of recent fabrication. Defendant argues that the interview's admission under Rule 11-801(D)(1)(b) was error, and that the 20-minute video of the interview improperly bolstered Little's testimony.

**{30}** We agree with Defendant that Little's prior consistent statement could not properly be admitted under Rule 11-801(D)(1)(b) as substantive evidence. There was no charge by the defense that the inconsistencies in Little's testimony were part of a conscious effort to lie, a requirement for admission under Rule 11-801(D)(1)(b). *See State v. Casaus*, 1996-NMCA-031, ¶ 14, 121 N.M. 481, 913 P.2d 669, *abrogated on other grounds by State v. Marquez*, 2023-NMSC-029, ¶¶ 24-27, 539 P.3d 303. Moreover, to the extent there was any suggestion of recent fabrication, or improper influence or motive, any such motive or influence arose on the day of the murder, when police officers suggested that the person Little described as "Sharky" was named Macario. Admission of a prior consistent statement as substantive, non-hearsay evidence under Rule 11-801(D)(1)(b) requires a showing that the fabrication, or motive, or influence originated *after* the prior consistent statement. "[O]nly those consistent statements made before the motive originated would be admissible" under Rule 11-801(D)(1)(b). *Casaus*, 1996-NMCA-031, ¶ 11.

**{31}** We nonetheless conclude that the admission of a portion of Little's prior consistent testimony was not error. Under the common law, where a witness's credibility is called into doubt by pointing to inconsistencies in a prior statement, as the defense did here in its cross-examination, the admission of the prior statement is relevant to rebut the attack on the witness's credibility. The district court does not abuse its discretion when it admits a prior consistent statement for this purpose—to rehabilitate the witness—and not for the prior statement's truth. *State v. Brown*, 1998-NMSC-037, ¶ 45, 126 N.M. 338, 969 P.2d 313 ("[W]e believe that prior consistent statements continue to be admissible on these [common law] theories *for purposes of rehabilitation.*").

**{32}** Our review of the record shows that, even though the district court cited Rule 11-801(D)(1)(b) as its basis for admitting the prior statement, the prior statement was introduced and relied on by the State solely to rehabilitate Little's trial testimony, and not for its truth. In closing argument, the State argued that the videotape of the interview showed that Little's testimony at trial was consistent with her statements immediately following the murder, and that her description of the murder *at trial* was therefore

reliable. We, therefore, conclude that the admission of 20 minutes of the videotaped interview was not error.

**{33}** Defendant also points to particular statements in the video, which he now argues were improperly admitted into evidence in violation of other rules of evidence. Defendant argues he was prejudiced by (1) Little's description of Victim as "nice, sweet, funny, and helpful," arguing this was improper character evidence, erroneously admitted in violation of Rules 11-404 and 11-405; (2) Little's description of how scared she was of Defendant, arguing this also was inadmissible character evidence; and (3) Little's mention that she met Defendant after his mother brought him home from a hospital in Las Vegas, arguing that this improperly informed the jury that Defendant had been in a mental hospital. Defendant failed to object to the admission of any of these statements either when the portions of the video were offered by the State, or during the playing of the video in court. The district court's ruling allowing a portion of the interview into evidence was limited to those portions of the interview rebutting the inference that her prior statements were inconsistent with her testimony at trial. Defendant had the opportunity to object to the inclusion of the statements he now challenges on appeal either prior to the video being played or during the video. Defendant did not object to the three statements he now challenges on appeal as inadmissible and prejudicial under other rules of evidence, and he does not argue that the admission of these statements was plain error. His sole objection to the admission of the video was to its admission as a prior consistent statement. Because these additional objections were not preserved, we do not address them.

### III.    Defendant's Claim of Prosecutorial Misconduct

**{34}** Defendant argues that it was prosecutorial misconduct for the State to elicit testimony from police officers alluding to the fact that there had been prior contacts between the Defendant and the police. Because the defense did not preserve this issue by requesting a mistrial in the district court, we review for fundamental error. *See* Rule 12-321(B) NMRA ("This [preservation] rule does not preclude . . . the appellate court, in its discretion, from considering . . . issues involving: . . . fundamental error . . . or . . . fundamental rights of a party.").

**{35}** "Prosecutorial misconduct rises to the level of fundamental error when it is so egregious and had such a persuasive and prejudicial effect on the jury's verdict that the defendant was deprived of a fair trial. An isolated, minor impropriety ordinarily is not sufficient to warrant reversal, because a fair trial is not necessarily a perfect one." *State v. Trujillo*, 2002-NMSC-005, ¶ 52, 131 N.M. 709, 42 P.3d 814 (internal quotation marks and citations omitted). To find prosecutorial misconduct under a fundamental error standard, "we must be convinced that the prosecutor's conduct created a reasonable probability that the error was a significant factor in the jury's deliberations in relation to the rest of the evidence before them." *State v. Sosa*, 2009-NMSC-056, ¶ 35, 147 N.M. 351, 223 P.3d 348 (internal quotation marks and citation omitted).

**{36}** Defendant bases his claim of prosecutorial misconduct on three instances where a prosecution witness alluded to Defendant's prior encounters with law enforcement, arguing that the State "purposely elicited the fact that [Defendant] is well-known to law enforcement, multiple times, and failed to caution the officers that such testimony was inadmissible," acting "in willful disregard as to whether their conduct would result in mistrial, retrial or reversal."

**{37}** The first time a law enforcement officer testified that the officer was familiar with Defendant, Defendant alleges that the prosecutor talked over defense counsel when he tried to object to the testimony. Little had testified that she knew Defendant by the nickname "Sharky," and that she knew, but could not pronounce his first name, but knew it was "Macario." The prosecutor asked Officer Delgado if he was "familiar with [the moniker 'Sharky,']." The prosecutor interjected, before the officer could answer, cautioning the officer that he should not get "into too much detail, just in a general sense." As the prosecutor was cautioning the witness, defense counsel began an objection "I'm going to-" but did not finish the sentence either during or after the prosecutor had finished the question. Officer Delgado responded that he had "prior dealings" with the Defendant.

**{38}** In the second instance, the prosecutor asked Officer Chavez how he had recognized Defendant as the person identified by Little when he first contacted him, and Officer Chavez testified that he knew Defendant "[f]rom previous knowledge[,] I've dealt with him before." When the prosecutor attempted to pursue this answer further, Defendant objected, resulting in a bench conference during which the judge ordered the State to stop eliciting testimony about Defendant's previous encounters with law enforcement.

**{39}** Approximately ten minutes after this reprimand by the judge, Officer Cardoza testified that "I, myself, had dealt with [Defendant] previously and I knew that he was –" before he was interrupted by Defendant's objection. At the bench conference that followed, defense noted he was going to move for a mistrial, but did not. The judge instructed the prosecutor to "watch it very carefully [and] have it not happen [again]."

**{40}** We are not persuaded that "the prosecutor's conduct created a reasonable probability that the error was a significant factor in the jury's deliberations in relation to the rest of the evidence before them." *Sosa*, 2009-NMSC-056, ¶ 35 (internal quotation marks and citation omitted). The evidence important to the jury's verdict was the accuracy of Mrs. Little's identification of Defendant and her testimony that "Sharky" and Defendant were the same person. Little made that connection by testifying that one of the officers asked her if Sharky's name was "Macario," which she testified was his real name. The initial testimony elicited by the prosecution therefore was arguably relevant to support this identification, and was not the subject of an objection. In the third instance, the officer volunteered information, nonresponsive to the prosecutor's question. *State v. Allen*, 2000-NMSC-002, ¶ 42, 128 N.M. 482, 994 P.2d 728 ("The testimony suggesting [prior bad acts] was brief, inadvertent, and not responsive to the prosecutor's question."). In both the second and the third instances, the judge

admonished the prosecutor. Defendant did not request a curative instruction. *State v. Sandoval*, 1975-NMCA-096, ¶ 4, 88 N.M. 267, 539 P.2d 1029 (holding that it is incumbent on the Defendant to move to strike or ask for a curative instruction). The testimony that Defendant was previously involved with law enforcement, without any details concerning the nature of that involvement, was of no significance to the questions before the jury, and, its introduction, therefore, does not amount to fundamental error.

**CONCLUSION**

**{41}** Finding no error, we affirm the district court's judgment.

**{42} IT IS SO ORDERED.**

**JANE B. YOHALEM, Judge**

**WE CONCUR:**

**ZACHARY A. IVES, Judge**

**SHAMMARA H. HENDERSON, Judge**